**In re TIREY DISTRIBUTING COMPANY, Debtor.**

**Tirey Distributing Company, Plaintiff,**

v.

**Leon Sloan and Virginia Sloan, Defendants.**

**Bankruptcy No. 99–72329.**

United States Bankruptcy Court, E.D. Oklahoma.

Dec. 29, 1999.

David Pomery, Oklahoma City, OK, for plaintiff.

Mark A. Craige, Tulsa, OK, for defendants.

## *OPINION*

TOM R. CORNISH, Bankruptcy Judge.

The Debtor seeks rescission of his purchase of a greenhouse operation based upon fraud. The Defendants seek relief from the stay and conversion from Chapter 11 to Chapter 7. For the reasons stated hereafter, the Court denies the rescission of the contract and grants the Motion for Relief from Stay. The case will therefore be converted from Chapter 11 to Chapter 7.

Several matters in conjunction with this case came on for hearing with the trial of the adversary proceeding on the 20th day of December, 1999. The Debtor will be referred to as "Tirey" and Mr. and Mrs. Sloan will be referred to as "Sloan." Prior to the presentation of testimony, Tirey announced that it was dismissing, without prejudice, its turnover claim in Adversary No. 99–7105. The Court proceeded to hear testimony in support of and opposition to Tirey's claim for rescission based upon fraud and Sloan's Motion for Relief from Stay and Sloan's Motion to Convert Case from a Chapter 11 to Chapter 7. The Court has jurisdiction over the parties and the subject matter of this action in this core proceeding.

## *FINDINGS OF FACT*

Tirey and Sloan entered into a formal written Contract for Sale dated October 20, 1997, in which Tirey purchased from Sloan certain real estate, inventory, equipment, buildings and goodwill which were a wholesale and retail greenhouse business in Marshall County, Oklahoma. Sloan agreed to not compete with Tirey for five years. Sloan also agreed to act as a consultant and help in the business for Tirey's first two years of operation. Both Tirey and Sloan were represented by counsel in the negotiations and drafting of the Contract. The Contract reflected a purchase price of $900,000. However, Tirey executed a note and mortgage on real estate and gave Sloan a security interest in the fixtures and personal property of the business.

The $900,000 was to be paid as follows: $50,000 as earnest money upon the signing of the contract and $100,000 additional cash at the time of closing. Tirey executed a note in favor of Sloan in the amount of $750,000 with interest at 8% per annum payable at monthly interest and principal payments for a term of six (6) consecutive years as follows: July 1, 1998—$35,000; July 2, 1999—$85,000; July 1, 2000—$135,000; July 1, 2001—$155,000; July 1, 2002—$155,000; and July 1, 2003—$185,000.

The Court finds that Sloan received the following payments from Tirey: interest payments from December 31, 1997 to June 30, 1999—$94,355; consulting fees for 1998 and 1999—$71,250; a payment of $20,000 on the covenant not to compete; principal payment on December 5, 1997 of $147,500; and principal payment on October 8, 1998 of $2,500, for a total of $150,000. The Court therefore concludes that Tirey has made payments to Sloan under the Contract in the amount of $335,605.

Prior to the closing, Sloan gave to Tirey a 1995 profit or loss statement reflecting gross income from the greenhouse of $399,838; a 1994 profit or loss statement reflecting gross income of $607,000; a 1993

profit or loss statement showing gross income of $531,000. These profit or loss statements came directly from Sloan's filed federal tax returns. Sloan also paid his accountant, Martha Rogers, CPA, to visit and consult with Tirey for approximately four hours prior to the closing of this transaction.

Sloan has been in the wholesale and retail flower business for approximately thirty-two (32) years, and started this business with a $300 investment as a fruit stand in Kingston, Oklahoma. Throughout the years, he has expanded into a retail and wholesale operation with over forty (40) greenhouses. Most of these greenhouses are covered with cloth or plastic. Sloan never carried much debt with the greenhouse operation, except that he would borrow money in the fall to purchase pots and plants and would repay the loan the following year. There has never been any long term debt incurred on the nursery operation by Sloan. Mr. Sloan has a high school education.

Mr. Tirey has a Bachelor's Degree in Business and began working toward his MBA Degree. He has over twenty (20) years experience in the Coors Beer distribution business in Oklahoma City and Shawnee. He owned his own beer distributorship in Shawnee with two partners for a few years. When he sold that business, he returned to the Coors distributing business in Oklahoma City, where he became a Vice President and Regional Manager. Like Sloan, Tirey started out as a day laborer, and through hard work was able to rise to a top management position with the beer distributor.

Sometime in 1997, seeking a change of pace, Tirey and his wife decided to move to Lake Texoma. He became interested in the nursery business and contacted Sloan. Tirey has no previous experience in the agricultural or horticultural field.

Sloan had a price tag on the nursery business at one point of $1,500,000 which he had agreed to advertise over the Internet. After several discussions and visits between Tirey and Sloan, there was a verbal agreement and understanding for Tirey to purchase from Sloan the nursery business for $1,100,000, which included a promissory note in favor of Sloan in the amount of $900,000, $100,000 to be paid to Sloan for a covenant not to compete and $100,000 to be paid to Sloan as consulting fees. The retail side of the nursery business was operated by the Bettis family who was leasing the retail business for $30,000 per year. The Bettis family canceled their lease approximately six (6) months after Tirey took over the business and opened up another retail outlet down the road from the Tirey nursery.

After the parties agreed in principle to a purchase price of $1,100,000, Tirey commenced working diligently with his computer and spread sheets to draft numerous pro forma statements that reflected expenses which would be incurred in Tirey's operation of the nursery. Tirey met with Sloan on numerous occasions and discussed with Sloan certain projections of sales over the next ten (10) years and related expenses associated with the sales. Sloan told Tirey on more than one occasion that the sales increases as projected by Tirey's pro forma worksheets were obtainable but only through lots of hard work and the addition of drivers and trailers. Sloan did discuss with Tirey that there were untapped markets and new customers to be found in Dallas, Oklahoma City, and Tulsa which Sloan had not pursued during the past several years.

The Court finds that the most contentious aspect of this case litigated by the parties is the issue of whether or not Sloan made misrepresentations to Tirey on these projected sales and whether Tirey relied upon this on future sales projections in purchasing the nursery operation. The Court finds that the information that was given to Tirey by Sloan, i.e., the profit or loss statements from the tax returns, signed under oath, are accurate and truthful and the Court heard no testimony to

the contrary. The Court finds that the due diligence exercised by Tirey, which involved several weeks of research and planning, consisted primarily of consulting with Sloan and Sloan's accountant and preparing his own pro forma worksheets and submitting them to Sloan for discussion.

Sloan testified that he had little or no experience in projecting future sales. Tirey had a good handle on it and was comfortable in estimating the expenses necessary to run the nursery. The tenor of Tirey's evidence at trial was to convince the Court that whenever Tirey brought these future sales projections to Sloan that he acquiesced to the same and represented to Tirey that these projected sales could be met.

Sloan's "Exhibit A" is an Income Summary from 1988 to 1992 which Sloan says he gave to Tirey in July, 1997. Tirey does not deny receiving this Income Summary but stated he could not remember if he received it or not. The Court finds by a preponderance of the evidence that Tirey did receive this Income Summary which reflects sales in 1988 of $576,000; in 1989 of $477,000; in 1990 of $550,000; in 1991 of $580,000; and in 1992 of $497,000. An example of the future sales projections proposed by Tirey are reflected in Exhibit 3 as follows:

| | Sales | Net Income |
|--------|------------|------------|
| Year 1 | $ 885,000 | $210,000 |
| Year 2 | $ 983,000 | $272,000 |
| Year 3 | $1,061,000 | $320,000 |
| Year 4 | $1,099,000 | $347,000 |
| Year 5 | $1,212,000 | $411,000 |

These projections by Tirey were created and discussed with Sloan only after the parties had agreed in principle to a purchase price of $1,100,000. The Court finds by a preponderance of the evidence that it was unrealistic for a person of Tirey's business acumen, particularly with no prior experience whatsoever in the nursery business, to expect sales to increase the first year by approximately 50% and even increase more in the years thereafter. The Court finds that Tirey's due diligence consisted of creating these projections

without any realistic expectation except for getting Sloan's concurrence that the projected sales were obtainable with a lot of hard work and additional marketing. The Court finds that the marketing effort expended by Tirey to meet these projections involved Tirey only going out and soliciting the customers approximately a year after his taking over the business in October, 1997. The Court finds that Tirey had no marketing plan and did not have the resources to send people out to increase sales by calling on customers.

It appears to the Court and the Court so finds that once the price was agreed upon, Tirey spent a lot of effort in trying to justify to himself that he could make enough money to pay off a new business venture tremendously burdened with a substantial debt. The Court further finds that Tirey did not hire additional drivers and add trailers as he had anticipated when preparing his pro forma statements. In other words, Tirey made a bad business decision that was doomed for failure at the outset.

Tirey testified that the projections were necessary for him to get an SBA loan at BancFirst. Tirey borrowed $350,000 from BancFirst and pledged most of his personal assets which consisted of his homestead, a vehicle, a boat and another piece of real estate.

### CONCLUSIONS OF LAW

 A party may rescind a contract if his consent to such contract is obtained by fraud. Okla.Stat.Ann. tit. 15 § 233 (West Supp.1999). To recover under the theory of fraudulent misrepresentation, the plaintiff must prove "(1) the defendant made a material misrepresentation; (2) that it was false; (3) the defendant made the representation knowing it was false or in reckless disregard for the truth; (4) that the defendant made it with the intention that it should be acted upon by the plaintiff; (5) the plaintiff acted in reliance upon it; and (6) that plaintiff thereby suffered injury."

*Sturgeon v. Retherford Publications., Inc.,* 987 P.2d 1218, 1228 (Okla.Civ.App.1999): *Miller v. Troy Laundry Machinery Co.,* 178 Okla. 313, 62 P.2d 975, 979 (1936).

■ In the instant case, the Plaintiff does not make it past the first element that a false representation was made. The Plaintiff, in an attempt to justify the purchase price, prepared pro forma statements using his expertise as to the cost of running the business. He then worked backward in order to obtain sufficient revenue stream to cover the expenses. He would then take these pro forma statements to Sloan in an attempt to get him to agree with the figures. Sloan, not as sophisticated a business man as Tirey, would review the pro forma statements. Based upon the assumptions Tirey set forth, Sloan believed that the revenues would be "doable" with hard work. These figures were formulated by Tirey and then presented to Sloan. Sloan had given Tirey the best information he had available, the prior tax returns which the Court has found to be truthful and accurate.

These pro forma statements projected a 50% increase in sales the first year. Sloan testified he believed that if Tirey worked hard and obtained the accounts available he would be able to achieve these results. Tirey did not put into place the additional drivers he had told Sloan he was going to use. Just because the projection failed to materialize, does not amount to a material misrepresentation. Furthermore, it seems far fetched that Sloan would make such a representation when he was carrying such substantial debt.

■ A party seeking rescission must comply with the following rules:

1. He must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind; and

2. He must restore to the other party everything of value which he has received from him under the contract; or

must offer to restore the same, upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so.

Okla.Stat.Ann. tit. 15 § 235 (West 1993). Even assuming that there was a material misrepresentation, the Plaintiff did not rescind promptly. After the first growing season, the Plaintiff knew he would not be able to meet the debt obligation. There was no mention, at that time, of the Plaintiff's desire to rescind the contract. Thereafter, the next year when the payment to Sloan became due, the Plaintiff, once again, made no attempt to rescind the contract. Tirey did talk to Sloan about forbearance of payment and restructuring of debt which was done. It was not until this bankruptcy was filed and more specifically, this adversary proceeding, that any suggestion of a rescission of contract came to light.

■ Also, in order to rescind the contract, the Plaintiff must be able to restore everything of value which it received under the contract. However, the Court finds that the Plaintiff would not be able to fulfill such an obligation. Many of the greenhouses had plastic or cloth covering at the time the assets were transferred to Tirey. The covering is no longer on the greenhouses and will cost approximately $2,000–$3,000 according to Tirey. Furthermore, the Debtor has accumulated no money. It also appeared that the inventory had decreased since the time Tirey purchased the business. Additionally, there is no longer a lease on the retail business which amounts to $30,000 less in income per year. For the above reasons, the Court finds that the Plaintiff's cause of action for rescission must fail.

■ Sloan seeks relief from the automatic stay in order to pursue their foreclosure action. Relief from the automatic stay may be granted for the following instances:

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

 (2) with respect to a stay of an act against property under subsection (a) of this section, if—

 (A) the debtor does not have an equity in such property; and

 (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d). The party requesting the relief from the automatic stay has the burden of proof on the issue of debtors' equity in the property and the party opposing such relief has the burden of proof on all other issues. 11 U.S.C. § 362(g). Factors to be viewed in determining whether the stay should be modified for cause include: (1) an interference with the bankruptcy; (2) good or bad faith of the debtor; (3) injury to the debtor and other creditors if the stay is modified; (4) injuries to the movant if the stay is not modified; and (5) the portionality of the harms from modifying or continuing the stay. *In re Milne*, 185 B.R. 280, 283 (N.D.Ill.1995). "Cause" has no clear and limited definition and is therefore determined on a case by case basis. *In re Texas State Optical, Inc.*, 188 B.R. 552, 556 (Bankr.E.D.Tex. 1995). "Although under § 362(g)(2), the debtor has the burden of proof on the issue of 'cause,' the [moving party] has the burden of going forward with the evidence in the first instance to establish that there are some facts to support its allegation of 'cause.' " *In re Tursi*, 9 B.R. 450, 453 (Bankr.E.D.Pa.1981).

█ In this case, the Debtor does not intend to reorganize. If the rescission was successful, the Debtor testified he intended to file a liquidating plan to pay claims with monies which resulted from the rescission of the contract. As of the date of the hearing, the Debtor was not operating the business. It was unclear whether the Debtor intended to care for the plants during this interim period. However, the inventory needs attention especially during the winter season. Sloan would clearly be harmed if the plants died since he is the largest creditor. No other creditor objected to Sloan's Motion for Relief from Stay. As result, the Court finds "cause" exists to grant Sloan's relief from the automatic stay.

█ Sloan also filed a Motion to Convert this proceeding from Chapter 11 to Chapter 7. The Court may convert a case under Chapter 11 to a case under Chapter 7 for cause, including—

 (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

 (2) inability to effectuate a plan.

11 U.S.C. § 1112(b)(1)–(2). "Cause" is not defined in the bankruptcy code. The ten (10) grounds·enumerated in § 1112(b) are not exhaustive. *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989) (citations omitted). "[U]nder § 1112(b)(2), the Bankruptcy Court may dismiss or convert a Chapter 11 case if the debtor is unable to effectuate a plan, which means that the debtor lacks the ability to formulate a plan or carry one out." *Id.* If it appears that the debtors' business is too unstable to support a consistent payment string under the plan, "cause" may exist to convert or dismiss the case. 7 *Collier on Bankruptcy*, ¶ 1112.04[5][B] (Lawrence P. King ed., 15th ed. rev.1999).

█ Again, the Debtor in this case will be unable to effectuate a plan. Relief from the stay has been granted to Sloan to foreclose on all of their collateral. The Debtor does not intend to reorganize and its attempt to rescind the contract to recover monies from the contract with Sloan has been fruitless. The Debtor has not been able to accumulate any monies since the filing of this bankruptcy proceeding. As a result, the Court finds that the Motion to Convert should be granted.

IT IS THEREFORE ORDERED that the Plaintiff's Complaint for Rescission is **denied.**

A separate Order will be entered consistent with this opinion in the bankruptcy proceeding as to the Motion for Relief from Stay and Motion to Convert.