In re TIGER PETROLEUM
COMPANY, Debtor.

Steven W. Soulé, Trustee of the
Estate of Tiger Petroleum
Company, Plaintiff,

v.

Eric Alliot, Jr., et al., Defendants.

Bankruptcy No. 99–01273–M.
Adversary No. 01–0137–M.

United States Bankruptcy Court,
N.D. Oklahoma.

Dec. 30, 2004.

Bonnie N. Hackler, John T. Richer, Steven W. Soule, Tulsa, OK, for Plaintiff.

Mark A. Craige, Tulsa, OK, Neal Tomlins, Tulsa, OK, Steven B. Towbin, Chicago, IL, for Defendants.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

### Introduction

This is the story of a swindle. Arthur J. King ("King") was the sole shareholder in a company known as Tiger Petroleum Company ("Tiger"). King, through Tiger, ostensibly offered legitimate investments in oil and gas wells. King and Tiger found an eager market for their product. Unfortunately, instead of offering its investors a legitimate investment opportunity, Tiger offered King the chance to line his own pockets. Eventually, the weight of what he had done fell so heavily upon King that, rather than face the consequences of his actions, he committed suicide, leaving investors with millions of dollars in losses and little if any prospect of recovery.

Thereafter, Tiger sought the protection of this Court. A Chapter 7 bankruptcy case was filed, and Steven W. Soulé ("Soulé" or "Trustee") was appointed to serve as the trustee in this case. In March of 2001, Soulé brought this action against approximately 290 individuals and entities who had invested funds with Tiger, seeking to recover all or part of the monies paid to those investors by Tiger. In the nearly four years which have passed since the inception of this litigation, Soulé has made peace with almost all of the defendants herein. Some have paid to settle their claims. Some have convinced Soulé that he has no claim against them. Others have satisfied Soulé that they are judgment proof and that further efforts against them would be futile. A few have died. One small cadre of defendants remains.

Those remaining defendants (collectively, the "Defendants") claim to be innocent victims of King and his avarice, and contend that Soulé has no claim against them. They seek summary judgment dismissing them from this adversary proceeding. Concurrently, Soulé asks the Court to find as a matter of law that King and Tiger were engaged in an ongoing scheme to defraud their investors. If his motion is granted, Soulé intends to use it at trial as part of his case-in-chief. The parties have provided the Court with volumes of evidence and argument. After due consideration, the Court enters the following findings of fact and conclusions of law, as mandated by Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28

U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(H).

## Summary Judgment Standard

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[.]"[2] Courts must "view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party and determine whether there exists a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law."[3] In order to avoid summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."[4] If the nonmoving party fails to present facts establishing a genuine issue for trial, the moving party is entitled to summary judgment. An issue of material fact is genuine if the factfinder could return a verdict for the nonmoving party.[5]

## Findings of Fact

Tiger was an Oklahoma corporation. It was ostensibly engaged in the development and operation of oil and gas wells in Ohio and perhaps other states as well. Tiger formed limited partnerships for the sale of these oil and gas interests. Until sometime in March 1998, King was the sole operating officer of Tiger. In March of 1998, King disappeared. Upon the disappearance of Arthur King, the business operations of Tiger ceased. King was later found dead, a victim of suicide. It appeared that King destroyed many of the records of Tiger before he ended his own life.

After King's death, efforts were undertaken to understand the financial enterprise that was Tiger. Initially, an action was commenced in the District Court in and for Tulsa County, Oklahoma, and a receiver was appointed to investigate the operations of Tiger. When Tiger became a debtor in a Chapter 7 bankruptcy case, that responsibility fell upon Soulé. After completion of his review of the available records of Tiger, Soulé has become convinced that Tiger was engaged in a classic "Ponzi" scheme.[6]

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2004). All other references to federal statutes and rules are also to West 2004 publications.

2. FED. R. CIV. P. 56(c), made applicable to this adversary proceeding pursuant to FED. R. BANKR. P. 7056.

3. *Henderson v. Inter–Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir.1994) (citation omitted); *see also Kojima v. Grandote Int'l LLC (In re Grandote Country Club Co.)*, 252 F.3d 1146, 1149 (10th Cir.2001).

4. *Grandote*, 252 F.3d at 1150 (quotations and citation omitted).

5. *Henderson*, 41 F.3d at 569 (quotations and citation omitted); *see also Lawmaster v. Ward*,

125 F.3d 1341, 1347 (10th Cir.1997) ("The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine;' an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable [factfinder] could find in favor of the nonmovant." (citation omitted)).

6. The United States Court of Appeals for the Tenth Circuit has defined a "Ponzi scheme" as

... an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

Each of the Defendants seeking summary judgment against Soulé invested monies with Tiger and received dividends from Tiger which were less than the total amount invested. The Defendants, the amount invested, and the amount received are as follows:

| Defendant | Amount Invested | Amount Returned to Investor by Tiger |
| --- | --- | --- |
| Lestrino Baquiran | $ 60,000.00 | $ 50,706.13 (84.51%) |
| Souheil and Ruth Kandalaft | $ 50,000.00 | $ 34,695.59 (69.39%) |
| Woon Soon and Ai Ja Lee | $ 170,000.00 | $141,758.63 (83.39%) |
| Patricia Veraldo | $ 205,000.00 | $170,197.10 (83.02%) |
| Leon Greenblatt | $1,375,000.00 | $769,652.01 (55.97%) |
| Andrew Jahelka | $ 550,000.00 | $358,230.00 (65.13%) |
| Richard Nichols | $ 410,000.00 | $247,087.32 (60.26%) |

The investments in Tiger also carried certain tax advantages. Those Defendants deposed by Soulé readily admitted that the tax benefits of the Tiger investments were a factor in their decision to invest. There is no evidence which would indicate that the tax benefits represented by Tiger were any different than could be expected in any similar oil and gas venture, or that the promised tax benefits were illegal or invalid under the applicable tax laws.[7]

Most of the Defendants provided evidence regarding their knowledge (or lack thereof) regarding the real nature of Tiger's business. Each testified that he or she had no actual knowledge that King or Tiger was engaged in any manner of fraudulent activity. Soulé has admitted that he has no personal knowledge of or reason to believe that any of these Defendants knew of the fraud inflicted upon them by Tiger.[8] On the basis of this evi-

*In re Hedged–Inv. Assocs., Inc.*, 48 F.3d 470, 471 n. 2 (10th Cir.1995).

7. In opposition to the Defendants' summary judgment motions, Soulé has submitted an affidavit of Steve Rutherford in which Mr. Rutherford attempts to project or estimate the tax dollars saved by each Defendant as a result of their investment in Tiger. The Defendants have objected to the Court's consideration of Mr. Rutherford's calculations. Mr. Rutherford is a CPA who was retained by Soulé to review the financial dealings between Tiger and its investors. In his affidavit, Mr. Rutherford admits that his calculations of tax benefits are "estimates," and are not based upon a review of the financial condition of any particular defendant. As a result, the Court concludes that these projections of tax benefits by Mr. Rutherford lack sufficient foundation to be admissible as evidence, and the Court will not consider them in reaching its decision. In any event, as stated *infra*, the Court rejects the argument advanced by Soulé regarding the inclusion of any tax advantages in the calculation of value for purposes of a fraudulent transfer. Under the Court's analysis, the opinion of Mr. Rutherford is irrelevant.

8. On July 7, 2004, Defendants Greenblatt, Jahelka and Nichols took the deposition of Soulé. At said deposition, the following testimony was elicited:

Q. Sir, in your adversary proceeding against my clients, are you contending that my clients had knowledge that Tiger was a Ponzi scheme?

A. I'm not aware of any direct knowledge that your clients, I mean, that they knew it was a Ponzi scheme. I know that they deny that they knew it. And I don't have any evidence that says that they knew it.

*Deposition of Steven W. Soulé, Docket No. 436, Ex. 5*, p. 24, lines 19—25. Given that the

dence, the Court finds as undisputed fact that none of the Defendants had any actual knowledge of any of the fraudulent activities of either King or Tiger.

Much has been made of the due diligence (or lack thereof) undertaken by the Defendants prior to their investments in the oil and gas interests offered by Tiger. Although the parties dispute whether the Defendants performed proper and sufficient due diligence prior to investing their monies, there is no real dispute regarding the Defendants' education, investment history, or the amount of due diligence which they performed. Those facts may be summarized as follows:

1. *Lestrino Baquiran:* Dr. Baquiran is a medical doctor. He was introduced to King by Brian McDaid ("McDaid"), who was one of his financial advisors and who, at some point in time, prepared tax returns for Dr. Baquiran. The Tiger investments represented the only foray into the world of oil and gas investments by Dr. Baquiran. At the time he invested in Tiger, Dr. Baquiran was aware of other members of the medical profession who had also invested in Tiger offerings. Prior to the investment of funds, Dr. Baquiran met with King and heard what he described as "a thorough and businesslike presentation" regarding the oil and gas activities of Tiger. As part of the presentation, King presented detailed projections of the wells to be drilled, together with the expected rate of return. In addition, the parties discussed the poten-

tial tax benefits of investing in the limited partnership interests offered by Tiger. Dr. Baquiran never made any personal inspection of the purported oil well sites, either before or after making his investments.[9]

2. *Souheil and Ruth Kandalaft:* The Kandalafts made their investments in Tiger on the basis of advice they received from McDaid, a certified financial planner employed on their behalf. At all times until the collapse of Tiger, the Kandalafts received timely and what appeared to be accurate accountings of their investment and the return on the same.[10]

3. *Woon Soon and Ai Ja Lee:* Woon Soon Lee is also a medical doctor. He also learned of Tiger from McDaid, who served the Lees as their financial planner and accountant, a role which McDaid has held for the past 20 years. Tiger represented the first and last investment in oil and gas leases by the Lees. Dr. Lee met with King and received information from King in the same manner as Dr. Baquiran. Other than the information received from King, the Lees made no other independent review of the business operations of Tiger. Over the course of their investment, the Lees received all information and payments from Tiger on a timely basis. None of the checks issued by Tiger to the Lees were ever dishonored.[11]

deposition was taken over three years after the filing of this adversary proceeding, the Court concludes that if Soulé was destined to find evidence to establish that the Defendants had actual knowledge of the fraudulent activities of King and/or Tiger, he would have discovered it by now.

9. *Docket No. 436, Ex. 6.*

10. *Docket No. 436, Ex. 9.*

11. *Docket No. 436, Ex. 7.*

4. *Patricia Veraldo:* Ms. Veraldo is a registered nurse. She also learned of Tiger from McDaid. At that time, McDaid was her tax accountant, a position which he holds to this day. She had a meeting with King similar to those described above. Other than the information presented by King, Ms. Veraldo did not do any further investigation into the business affairs of Tiger. She was aware of the tax benefits which the investment offered.[12]

5. *Leon Greenblatt:* Mr. Greenblatt was introduced to Tiger and King by Scott Goldsher ("Goldsher"), an attorney who was working as a broker for Tiger. Mr. Greenblatt relied upon information which he received from Goldsher regarding the business of Tiger as he made his investment. According to Mr. Greenblatt, Goldsher made a representation that he had personally viewed the oil wells included in Mr. Greenblatt's investment. In addition, Mr. Greenblatt met with King in Chicago, at which time Mr. Greenblatt was given financial information and shown pictures of some of the wells which were represented by King to be included in Mr. Greenblatt's investment. Mr. Greenblatt also testified (by way of deposition) that the rate of return which he received on his investment with Tiger was similar to the return which he obtained on his other oil and gas investments. Mr. Greenblatt also stated that he received his dividend checks from Tiger on a regular basis, that none of those checks were dishonored, nor were any of the checks post-dated.[13]

6. *Andrew Jahelka:* Mr. Jahelka submitted an affidavit in which he indicated that he invested in Tiger on the advice of Goldsher, whom he described as a "tax advisor and attorney." Mr. Jahelka stated that he received his monthly payments from Tiger on a timely basis, and that the return on his investment "was in line with returns [he] anticipated based upon other investments with similar risks." None of the checks which he received were ever post-dated or dishonored.[14]

7. *Richard Nichols:* The deposition testimony of Mr. Nichols mirrors the testimony of Mr. Greenblatt.[15]

In addition to their own testimony, Defendants Greenblatt, Jahelka, and Nichols submitted the deposition testimony of Scott Goldsher. Goldsher testified that he had no reason to believe that Tiger was engaged in illegitimate activity until after the death of King.[16]

## Relief Sought

Soulé's Amended Adversary Complaint[17] contains the following causes of action:

Count I—Accounting for Ponzi Scheme Distributions

Count II—Actual Fraud

Count III—Constructive Fraud

Count IV—Recovery of Avoided Transfers

Soulé's Amended Motion for Partial Summary Judgment contains the following prayer for relief:

---

12. *Docket No. 436, Ex. 8.*

13. *Docket No. 427, Ex. B.*

14. *Docket No. 427, Ex. F.*

15. *Docket No. 427, Ex. C.*

16. *Docket No. 427, Ex. D.*

17. *Docket No. 357.*

WHEREFORE, the Trustee seeks judgment as a matter of law on the following issues: (1) that Debtor Tiger Petroleum Company was at all times relevant to this litigation operating a "Ponzi" scheme; and (2) that the Debtor made certain payments to the defendants named herein, investors in the Debtor's oil and gas· operations,with the actual intent to hinder, delay or defraud creditors of the Debtor.[18]

Soulé does not ask the Court to enter judgment in his favor on any of the causes of action which he has brought. Instead, he asks the Court to make determinations on certain issues which would then be binding on the parties in the ultimate trial of this adversary proceeding. Defendants, on the other hand, ask that judgment be entered in their favor as a matter of law, and that the complaints against them be dismissed with prejudice.

### Conclusions of Law

*Overview of the Arguments Presented*

 Soulé has brought this action under § 544(b) of the Bankruptcy Code and § 116 of the Uniform Fraudulent Transfer Act (the "UFTA").[19] The policy behind the UFTA and § 544 is to preserve assets of the estate for the benefit of creditors.[20] The Bankruptcy Code also contains a provision allowing a bankruptcy trustee to set aside fraudulent transfers, found in § 548.[21] The language of the UFTA and § 548 are nearly identical; the· only significant difference being a longer statute of limitations under Oklahoma law.[22] Many courts, considering the similarities in purpose and language, have concluded that the UFTA and § 548 are *in pari materia,* and that the same analysis applies under both laws.[23] The Court finds the reasoning behind these cases to be persuasive.

Soulé has pled counts sounding in both actual and constructive fraud, based upon his unwavering belief that Tiger and King were perpetrators of a Ponzi scheme. Defendants, while not admitting the existence of a Ponzi scheme for purposes of trial, are willing to assume for the purpose of summary judgment that the Debtor operated a Ponzi scheme.[24] This allows Defendants to raise the statutory defense found in § 120(A) of the UFTA, which provides that

> (A) A transfer or obligation is not voidable as provided for in paragraph 1 of subsection A of Section 5 [§ 116(A)(1) ]

---

18. *Docket No. 435,* at 14.

19. *See* OKLA. STAT. ANN. tit. 24 § 112 *et. seq.* (West 1987).

20. *See Mather v. Clancy (In re Honey Creek Entm't, Inc.),* 246 B.R. 671, 687 (Bankr. E.D.Okla.2000), *rev'd on other grounds,* 37 Fed. Appx. 442 (10th Cir.2002) (citing Oklahoma law); *Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 597 (9th Cir.1991).

21. *See* § 548. Soulé has not brought an action under § 548, presumably because only transfers made within one year of filing fall within its scope. *See* § 548(a).

22. *Compare* § 548(a)(1)(B) *with* OKLA. STAT. ANN. tit. 24 § 116(A)(2) (West 1987).

23. *See In re United Energy Corp.,* 944 F.2d at 594; *Solow v. Reinhardt (In re First Commercial Mgmt. Group, Inc.),* 279 B.R. 230, 240 (Bankr.N.D.Ill.2002) ("Except for different statute of limitations, the state and federal statutes are functional equivalents, and the analysis applicable [under federal law] is also applicable [under state law]."); *Levit v. Spatz (In re Spatz),* 222 B.R. 157, 164 (N.D.Ill.1998) ("Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA."); *cf. Kojima v. Grandote Int'l LLC (In re Grandote Country Club Co., Ltd.),*· 252 F.3d 1146, 1152 (10th Cir.2001).

24. *See supra* note 7.

of this act against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

\* \* \* \* \* \*

(D) Notwithstanding voidability of a transfer or an obligation pursuant to the provisions of the Uniform Fraudulent Transfer Act, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to:

\* \* \* \* \* \*

3. A reduction in the amount of the liability on the judgment.[25]

Defendants contend that, even if Tiger and King were engaged in the most fraudulent of activity, Defendants acted in good faith and gave more than they received. Having already suffered a loss, Defendants argue that they should not be forced to bear an even greater burden by being ordered to return to Soulé the monies which they received from Tiger during the course of their business relationship with Tiger.

Soulé contends that while Defendants may not have had actual knowledge of what Tiger was up to, they should have known that Tiger was engaged in fraud, and cannot be found to have acted in good faith. Soulé also argues that, as a result of the tax benefits which were gained as a consequence of these investments, each Defendant received more from Tiger than he or she invested. Therefore, Soulé argues, even if the Defendants are found to have acted in good faith, they remain liable to the bankruptcy estate. Defendants claim that, in any event, the Amended Motion for Partial Summary Judgment filed by Soulé is procedurally improper, and must be denied in its entirety.

*Propriety of the Amended Motion*

Federal Rule of Civil Procedure 56 ("Rule 56") governs the granting of summary judgment in federal courts, and is made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056. Rule 56(a) provides that

A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.[26]

The procedure for consideration of a motion for summary judgment is outlined in Rule 56(c):

**Motions and Proceedings Thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party may prior to the day of hearing serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is *entitled to judgment as a matter of law.* A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.[27]

Rule 56(c) speaks of the entry of *judgments.* Many courts which have considered the issue have held that, in order to

---

25. Okla. Stat. Ann. tit. 24 § 120(A) and (D).

26. Fed. R. Civ. P. 56(a).

27. Fed. R. Civ. P. 56(c) (emphasis added).

be a valid motion under Rule 56, a motion must seek to fully dispose of a particular claim or cause of action. Those courts have held that motions for partial summary judgment which seek judgment as a matter of law on certain facts or legal issues, but which would not, if granted, result in judgment on a claim, are improper. The reasoning behind these decisions is that "Rule 56(c) authorizes only the entry of judgments on claims, not single issues or elements that are not dispositive of judgment on those claims."[28] Other courts have noted that to allow for partial summary judgment on issues instead of claims "would result in bifurcated proceedings that could only delay unnecessarily the progress of the litigation."[29]

■ This Court agrees with the decisions cited *supra*. Judgment means judgment. A summary judgment motion must seek a judgment upon a claim or cause of action in order to be procedurally proper. Any other rule creates a procedural morass, and fails to streamline the task of litigation. Because of the nature of summary judgment (which is epitomized by the word "summary"), the Court looks at evidence offered in support of (or opposition to) a motion for summary judgment differently than it looks at evidence offered at trial. Instead of weighing evidence, the Court construes evidence offered in support of or opposition to summary judgment motions in a light most favorable to the opposing party. Similarly, there are differing standards of review of summary judgments and judgments issued after trial. If a court grants summary judgment on a claim in its entirety, the reviewing court has a straightforward task. The reviewing court has a similarly straightforward task if judgment is rendered after trial. Were the Court to consider granting summary judgment on issues which were not dispositive, it would necessarily be requiring appellate courts to mix the standards of review on appeal. Some issues would be reviewed under the standard reserved for summary judgment, while others would be looked at using the standard set for review after trial on the merits. Such a mixing would not serve judicial economy.

■ This does not mean that a trial court is left without the means to separate the factual wheat from the chaff. Rule 56(d) provides that

**Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and

**28.** *City of Wichita v. U.S. Gypsum Co.,* 828 F.Supp. 851, 869 (D.Kan.1993), *rev'd on other grounds,* 72 F.3d 1491 (10th Cir.1996); *see also S.E.C. v. Thrasher,* 152 F.Supp.2d 291, 295 (S.D.N.Y.2001) ("The plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues.'').

**29.** *Capitol Records, Inc. v. Progress Record Distrib., Inc.,* 106 F.R.D. 25, 28 (N.D.Ill. 1985).

the trial shall be conducted accordingly.[30]

This rule allows the court to determine what facts (not legal issues) are not in dispute and enter an order, similar in fashion to the statement of undisputed facts which is routine in pre-trial orders submitted in this Court, establishing those facts for the purpose of trial. Whether to enter such an order is left to the discretion of the trial court; parties are not allowed to file a motion under Rule 56(d).[31]

■ Soulé has filed a complaint containing four separate causes of action. In his motion for summary judgment, he does not ask for judgment as a matter of law on any of them. Instead, he asks the Court to find as a matter of law that King and Tiger were engaged in a Ponzi scheme, and therefore acted with actual intent to hinder, delay, or defraud their creditors. Were the Court to grant Soulé's motion, it would not result in the entry of a judgment in favor of Soulé on any of his causes of action. The matter would still proceed to trial. In light of this fact, the motion cannot be construed as a proper motion for summary judgment under Rule 56. The arguments of the Defendants in this regard are well taken. Accordingly, the Amended Motion for Partial Summary Judgment filed by Soulé shall be denied.

*Good Faith*

Soulé and the Defendants have spent a considerable amount of time and energy arguing about whether the Court can determine, as a matter of law, if the Defendants acted in good faith when they invested their money with King and Tiger. The Defendants claim that they had no knowledge of the fraud inflicted upon them, and that they acted with reasonable diligence over the course of their relationship with King and Tiger. Defendants rely upon several facts, including that they invested in Tiger upon the recommendation of their accountants and/or tax advisers, that the rate of return offered by Tiger was not excessive for an investment in oil and gas leases, that Tiger never paid them in a suspicious fashion (such as by the use of post-dated checks), and that, until the scheme collapsed, Defendants always received their payments from Tiger on a timely basis. Soulé does not take issue with Defendants' statements that they had no knowledge of the wrongful activities of Tiger. Soulé does take issue with their claims that they acted with due diligence. He claims that a reasonable investor who had undertaken any direct investigation of the business activities of Tiger would have discovered that something was amiss.

■ Good faith must be established using an objective standard and is primarily a question of fact.[32] Under the objective standard, "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and if a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent."[33] While an investor's lack of

---

30. FED. R. CIV. P. 56(d).

31. *City of Wichita*, 828 F.Supp. at 869 ("This rule [Rule 56(d)] does not authorize an independent motion to establish certain facts as true but merely serves to salvage some constructive result from the judicial effort expended in denying a proper summary judgment motion.") (citations omitted); *Mendenhall v. Barber-Greene Co.*, 531 F.Supp. 947, 948 (N.D.Ill.1981) ("Rule 56(d) is not an independent provision permitting the singling out of limited issues on which the Court's advice may be obtained."); *Capitol Records, Inc.*, 106 F.R.D. at 29 (same, citing *Mendenhall*).

32. *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1338 (10th Cir.1996).

33. *Id.* at 1338 (citations omitted).

actual knowledge of a debtor's fraudulent purpose is one indicator of objective good faith, it is not determinative. Factors which have been considered by the Tenth Circuit to be relevant include the defendant's experience as an investor, the rates of promised return relative to market rates for similar risk, whether the debtor received plausible explanations for any unreasonably high rates of return, and whether the defendant ever received post-dated checks from the debtor or the debtor's checks were ever dishonored.[34] The Defendants bear the burden in proving their good faith.[35] In order to prevail on a summary judgment motion, the Defendants must produce evidence supporting each element of that defense such that no reasonable jury would disbelieve it.[36]

■ Summary judgment on the issue of good faith is problematic. The Court has been provided little, if any, information regarding the investment experience of the individual Defendants. Each of the Defendants claims to have been introduced to Tiger and King by a trusted financial advisor and/or tax accountant, on whom they relied.[37] The parties have presented no evidence regarding whether the promised rates of return were excessive, other than one Defendant's statement that his expected rates of return were in line with other investments involving similar risk.[38] We have no evidence of an industry standard of due diligence, or whether the tax benefits which the Tiger investments offered were such as to give a reasonable investor pause. Viewing the evidence in a light most favorable to the Trustee, for each Defendant there remain questions of fact as to whether a reasonable person would have been placed on notice of Tiger's fraudulent purpose under these circumstances, or should have done more in the way of due diligence before investing funds. The Court is unable to find as a matter of law that Defendants acted in good faith and must deny the Defendant's motion for summary judgment on that issue.

### Reasonably Equivalent Value

■ In his third claim for relief, Soulé claims that Tiger "received less than reasonably equivalent value" from the Defendants in exchange for the monies which Tiger paid to them. The United States Court of Appeals for the Tenth Circuit has ruled in a case involving strikingly similar facts. In *Jobin v. McKay (In re M & L Business Machine Co.)*,[39] a case cited by both Soulé and the Defendants, the officers of M & L were engaged in a Ponzi scheme. In that case, M & L offered McKay a return of ten per cent per month (120 % per year), or, on at least one occasion, nine per cent *per week (468 % per year)*.[40] The dividends were paid by M & L using post-dated checks which were issued to McKay at the time he made his investments. On at least one occasion, a dividend check bounced and had to be redeposited in order to be paid. McKay invested a total of $207,500 in M & L and

34. *Id.* at 1338–39. *See also Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 879 (Bankr.N.D.Ill.2000).

35. *See In re M & L Bus. Mach. Co.*, 84 F.3d at 1338.

36. *In re Lake States Commodities, Inc.*, 253 B.R. at 879.

37. *Docket No. 427*, at 3–4 ¶ 14, 19; *Docket No. 436*, at 3 ¶ 8.

38. *Affidavit of Andrew Jahelka, Docket No. 427, Ex. F*, at 2 ¶ 5.

39. 84 F.3d 1330 (10th Cir.1996).

40. *Id.* at 1332.

was paid dividends totaling $43,500.[41] As in the instant case, although McKay reviewed financial information provided to him by the officers of M & L, he made no independent effort to verify the same.[42]

M & L filed a Chapter 11 bankruptcy case that was ultimately converted to Chapter 7. Jobin was appointed to serve as Chapter 7 trustee. She then brought an action against McKay to recover all of the monies paid to McKay by M & L using theories of preference and fraudulent transfer. The bankruptcy court granted summary judgment to Jobin on the preference claim, which resulted in a judgment in favor of the bankruptcy estate of $22,000. With respect to the claim of fraudulent transfer, McKay claimed that he was entitled to the "good faith" defense outlined in § 548(c). The bankruptcy court rejected McKay's claim that he had acted in good faith and concluded that under § 548(a)(1)(A), the trustee could recover the entire $43,500 received by McKay from M & L.[43] However, on the issue of whether McKay had provided the debtor with reasonably equivalent value, the bankruptcy court ruled in favor of McKay, finding that, since he had been paid less than the amount of his investments, he had a viable restitution claim against M & L. The district court and court of appeals affirmed.[44]

■ The following portion of the circuit court opinion is relevant to the dispute herein:

[T]he question before us is whether an individual investor who should have known of a fraudulent scheme but did not have actual knowledge has a colorable restitution claim to recover his investment.

Upon review of the applicable law, we conclude that Mr. McKay has such a claim. One who has been fraudulently induced to enter into a contract may rescind the contract and recover the benefits that he has conferred on the party who has defrauded him. *See Western Cities Broadcasting v. Schueller*, 849 P.2d 44, 48 (Colo.1993) (en banc); *Trimble v. City & County of Denver*, 697 P.2d 716, 723–24 (Colo. 1985). Importantly:

> A suit in equity for rescission of a contract ... does not necessarily fail because the party seeking rescission was unreasonable in relying upon the misrepresentation made by the other party. Even negligence on the part of the party seeking rescission will not bar equitable relief when the misrepresentation was made intentionally by the other party.

*Pacific Maxon, Inc. v. Wilson*, 96 Nev. 867, 619 P.2d 816, 817 (1980).

Colorado courts have applied this principle to allow a party fraudulently induced to enter into a contract to recover the full amounts paid even when the defrauded party acted negligently and had inquiry notice of the fraud. For example, in *Enerwest, Inc. v. Dyco Petroleum*

---

41. *Id.*

42. *Id.* at 1334.

43. Since this case was decided, § 548(a) has been amended by the Religious Liberty and Charitable Donations Protection Act of 1997, Pub.L. 105–183, 112 Stat. 517 (1998). This resulted in a renumbering of this section, such that subsections 548(a)(1) and 548(a)(2) respectively are now §§ 548(a)(1)(A) and 548(a)(1)(B). *See Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 870 n. 4 (Bankr.N.D.Ill.2000).

44. This was certainly a hollow victory for McKay, since each court along the way ordered McKay to return to the bankruptcy trustee all of the monies which he had been paid by M & L based on the § 548(a)(1)(A) and § 547(b) claims.

*Corp.*, 716 P.2d 1130, 1132 (Colo.App. 1986), the court concluded that a company that had entered into a contract to acquire an easement was entitled to "restitution of the full amount paid under the contract" because the parties purporting to convey the easement had fraudulently concealed the fact that they had previously conveyed the easement to a third party. The court observed that the defrauded parties' right to recover restitution was unaffected by the fact that they had inquiry notice of the prior conveyance. *Id.*; see also *Loden v. Drake*, 881 P.2d 467, 469 (Colo.App. 1994) (noting that a party's failure to read certain provisions of a contract does not preclude restitution if the other party fraudulently concealed other contractual terms).

In this case, the evidence in the record indicates that Mr. McKay was fraudulently induced to invest in M & L. As a result, in light of the bankruptcy court's factual finding that he did not have actual knowledge of the fraud, Mr. McKay has a colorable claim to recover the amounts that he invested in M & L. The bankruptcy and district courts thus properly concluded that M & L's payments to Mr. McKay reduced the amount of this restitution claim, that M & L thereby received reasonably equivalent value for its payments to him, and that the trustee was not entitled to avoid the transfers under [§ 548(a)(1)(B)].[45]

Oklahoma law, like Colorado law, allows a party who has invested in a fraudulent scheme without knowledge of the fraud to rescind the transaction.[46] It follows that in such a situation, the person who rescinds is entitled to offset the consideration which he or she paid against any amounts claimed by the perpetrator of the fraud or, in this case, the trustee of its bankruptcy estate.

Applying the principles outlined in *In re M & L Business Machine Co.* to the case at bar, Soulé has presented no evidence which could, in any light, support a finding that the Defendants had actual knowledge of the misdeeds of King and Tiger. Each Defendant has testified that they had no such knowledge, and Soulé has testified that, after three years of litigation, he has no evidence that would indicate that these Defendants had any knowledge of Tiger's malfeasance. As a matter of simple mathematics, if one simply compares dollars invested to dollars returned, each of the Defendants received less from Tiger than they put in. Defendants contend that the inquiry ends here. Unless Soulé is somehow entitled to add something to the money which the Defendants received into the equation, Defendants are entitled to judgment on the third claim for relief as a matter of law.

Soulé advances a novel and creative theory in support of his claim that the Defendants did not give "reasonably equivalent value" to Tiger. He contends that the Court should look beyond the dollars and cents which flowed between the parties and consider the tax benefits which his accountant claims were derived from the

---

45. *Id.* at 1341–42 (statutory references have been changed to reflect the current numbering system (*see supra* note 44)) (footnote omitted) (emphasis added).

46. See Okla Stat. Ann. tit. 15 § 233 (West 1987); *First Nat'l Bank in Durant v. Honey Creek Entm't Corp.*, 54 P.3d 100, 104 (Okla. 2002) ("Fraud vitiates everything it touches, and a contract obtained thereby is voidable.") (citing *Bredouw v. Jones*, 431 P.2d 413, 419 (Okla.1966)); *Dusbabek v. Bowers*, 173 Okla. 53, 43 P.2d 97 (1934); *In re Tirey Distrib. Co.*, 242 B.R. 717, 721 (Bankr.E.D.Okla.1999) ("A party may rescind a contract if his consent to such contract is obtained by fraud.").

transactions by the Defendants.[47] Soulé asserts that if one adds the tax benefits to the dollars received, the Defendants received far more out of their relationship with Tiger than the money they invested, and that they should be held accountable to the bankruptcy estate for the amount by which their payments from Tiger plus their purported tax benefits exceed the amount of money which the Defendants gave to Tiger. The argument appears to be a novel one, as neither Soulé, counsel for the Defendants, nor the Court could unearth any authority directly or indirectly in support of the proposition.

The law which does exist does not support Soulé's position.

Where causes of action under Code § 548(a)(1)(B) are brought against Ponzi scheme investors, the rule applied in the majority of cases is that to the extent that investors have received payments in excess of the amount they have invested, those payments are voidable as fraudulent transfers. To determine the amount recoverable, payments received from the perpetrators of a scheme are "netted" against the amounts invested.

Bankruptcy courts have generally allowed Ponzi scheme investors to retain payments up to the amount invested because investors have claims for restitution or rescission against the debtor that operated the scheme.[48]

The United States Court of Appeals for the Tenth Circuit falls within that number of courts which allow investors to keep monies which are less than or equal to the amount invested.[49]

Soulé asks the Court to venture beyond consideration of the monies which changed hands between the investor and the fraud perpetrator, estimate the tax benefits of the transaction, and add those benefits to the mix. The Court respectfully declines to do so. The United States Court of Appeals for the Tenth Circuit has never adopted such a stance; instead, it has allowed offsets of money received against money invested. Both the UFTA and § 548 talk about "value" in the context of value exchanged between the transferor and transferee.[50] Any tax benefits which the Defendants may have received were not bestowed upon them by King or Tiger; they were granted by the tax laws and the taxing authorities. What the taxing authorities giveth, they may also taketh away. Soulé is asking the Court to take the first step on what would be a very slippery (and possibly inequitable) slope. Investors in a Ponzi scheme who are identical except for their personal tax circumstances would face the prospect of being treated completely differently under the law of fraudulent conveyances. Furthermore, if we begin by examining tax advantages, where would the inquiry end? Would the Court be expected to calculate the value of intangible benefits, or benefits

**47.** As noted *supra* at note 7, the Court has found inadmissible the testimony of Mr. Rutherford in which he purported to calculate the tax benefits received by each Defendant. On the basis of that ruling, the Court could refuse to consider the argument advanced by Soulé regarding the inclusion of tax benefits as "value." However, in the eyes of the Court, the question which Soulé raises is a question of law. The Court believes that a ruling on this legal issue now may well assist the parties (and any reviewing court) in the future.

**48.** *In re Lake States Commodities, Inc.,* 253 B.R. at 871 (and cases cited therein).

**49.** *See In re M & L Business Machine Co., Inc.,* 84 F.3d at 1330.

**50.** *See* OKLA. STAT ANN. tit. 24 § 120(A) and (D) and § 548(c).

which hold beauty only in the eye of a beholder, as it determines what "value" was given to the defendant in a fraudulent transfer action?[51] Those decisions which have limited their inquiry to a mathematical comparison of the monies exchanged between the parties are sound and well-reasoned, and will be followed by this Court until a controlling authority dictates otherwise.

### Conclusion

The amended motion for partial summary judgment filed by Soulé is denied. The motions for summary judgment filed by Defendants Lestrino Baquiran, Souheil and Ruth Kandalaft, Woon Soon and Ai Ja Lee, Patricia Veraldo, Leon Greenblatt, Andrew Jahelka, and Richard Nichols are granted in part and denied in part. Count III of the Amended Complaint filed herein is dismissed with prejudice as to those defendants. A separate judgment in accordance with this Memorandum Opinion is entered concurrently herewith.

### JUDGMENT

Presently before the Court is the Amended Motion for Partial Summary Judgment filed by Steven W. Soulé, Trustee for the Estate of Tiger Petroleum Company ("Plaintiff" or "Trustee"), Plaintiff herein; the Motion for Summary Judgment, filed by Lestrino Baquiran, Soulheil Kandalaft, Ruth Kandalaft, Woon Soon Lee, Ai Ja Lee, and Patricia Veraldo, Defendants herein; and the Motion for Summary Judgment, filed by Leon Greenblatt, Andrew Jahelka, and Richard Nichols, Defendants herein. The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that the Amended Motion for Partial Summary Judgment (*Doc. No. 435*) filed by Steven W. Soulé, Trustee for the Estate of Tiger Petroleum Company, Plaintiff herein be, and the same hereby is, denied.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (*Doc. No. 436*), filed by Lestrino Baquiran, Soulheil Kandalaft, Ruth Kandalaft, Woon Soon Lee, Ai Ja Lee, and Patricia Veraldo, Defendants herein be, and the same hereby is, granted in part and denied in part.

IT IS FURTHER ORDERED that the Motion for Summary Judgment (*Doc. No. 426*), filed by Leon Greenblatt, Andrew Jahelka, and Richard Nichols, Defendants herein be, and the same hereby is, granted in part and denied in part.

IT IS FURTHER ORDERED that Count III of the Amended Adversary Compliant (*Doc. No. 357*) filed by Steven W. Soulé, Trustee for the Estate of Tiger Petroleum Company, Plaintiff herein be, and the same hereby is, dismissed with prejudice as to Defendants Lestrino Baquiran, Soulheil Kandalaft, Ruth Kandalaft, Woon Soon Lee, Ai Ja Lee, Patricia Veraldo, Leon Greenblatt, Andrew Jahelka, and Richard Nichols.

---

**51.** To illustrate through the use of an absurd example, let us assume that, instead of cash, the fraudfeasor paid one of its investors by transfer of a classic car, with a fair market value of $10,000. Let us further assume that this car happened to be a perfect replica of the first car this investor had ever owned, and was thus, to use the word made famous in a recent series of credit card commercials, "priceless." Is the Court to value the vehicle at $10,000, or conduct an inquiry to determine the subjective value to this investor of having a piece of his youth restored to him? In the eyes of this Court, the simpler the analysis, the better.