# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES H. DONELL, Receiver for
J.T. Wallenbrock & Associates
and Citadel Capital Management
Group, Inc.,

*Plaintiff-Appellee,*

v.

ROBERT KOWELL,

*Defendant-Appellant.*

No. 06-55544

D.C. No.
CV-04-09702-ER

OPINION

Appeal from the United States District Court
for the Central District of California
Edward Rafeedie, District Judge, Presiding

Argued and Submitted
December 6, 2007—Pasadena, California

Filed July 1, 2008

Before: Pasco M. Bowman,* Melvin Brunetti, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

---

*The Honorable Pasco M. Bowman, United States Circuit Judge for the Eighth Circuit, sitting by designation.

## COUNSEL

Richard D. Ackerman, Temecula, California, for the defendant-appellant.

Peter A. Davidson, Los Angeles, California, for the plaintiff-appellee.

## OPINION

BYBEE, Circuit Judge:

Robert Kowell found an investment opportunity that sounded too good to be true. In Kowell's case, it wasn't. J.T. Wallenbrock & Associates ("Wallenbrock") promised Kowell a 20 percent return on his investment every ninety days, risk free, and that is nearly what he got. Because he received regular interest payments from Wallenbrock, Kowell was quite surprised to learn later that an SEC investigation had revealed the business to be a Ponzi scheme in which thousands of investors had been defrauded. Several years after Kowell first invested, and long after he had spent his returns, he was informed by the receiver for Wallenbrock that California law requires him to pay back all of his gains. Kowell challenges a judgment requiring him, as an innocent investor, to disgorge

his profits as fraudulent transfers under the Uniform Fraudulent Transfer Act. He also asks this court to permit him to offset any liability by amounts paid in federal income taxes on his earnings. The district court found that Kowell was liable to repay $26,396.10, plus pre-judgment interest of $5,159.22. We affirm.

I

A

The Uniform Fraudulent Transfer Act ("UFTA") as adopted by California states in relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> > (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
> >
> > (2)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
> >
> > > (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
> > >
> > > (B)  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Cal. Civ. Code § 3439.04(a).[1]

Courts have routinely applied UFTA to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors.[2] *See, e.g.*, *In re Agric. Research & Tech. Group*, 916 F.2d 528, 534 (9th Cir. 1990) ("*Agritech*"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995). The Ponzi scheme operator is the "debtor," and each investor is a "creditor." *See Scholes*, 56 F.3d at 755 (explaining that defrauded Ponzi scheme investors are actually tort creditors). The profiting investors are the recipients of the Ponzi scheme operator's fraudulent transfer.

## B

Robert Kowell and his mother Edna were two of the thousands of investors in a Ponzi scheme operated by Wallenbrock. *See SEC v. J.T. Wallenbrock*, 313 F.3d 532 (9th Cir. 2002) (detailing the scheme). Wallenbrock promised investors a 20 percent return in ninety days, by using their money to provide working capital to Malaysian latex glove manufacturers. *Id.* at 535-36. Ordinarily, Wallenbrock claimed, these manufacturers had to wait eighty to ninety days after shipment to collect payments from buyers. Wallenbrock would purchase these manufacturers' accounts receivables at a significant discount, providing the glove manufacturers with

---

[1] Notwithstanding the quoted language above, all courts construing UFTA state that there is an "or" between subsections (a)(1) and (a)(2).

[2] A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991). *See generally Cunningham v. Brown*, 265 U.S. 1, 7-9 (1924) (detailing the remarkable criminal financial career of Charles Ponzi).

immediate access to working capital. Wallenbrock investors, in turn, would enjoy a 20 percent return when Wallenbrock collected the receivables from glove purchasers in due time. *Id*. In reality, the officers of Wallenbrock took the investors' money and used some of it to pay off earlier investors, some to pay for personal expenses, and some to invest in risky start-up companies.

In January of 2002, the Securities and Exchange Commission ("SEC") brought a civil enforcement action against Wallenbrock, alleging that it was engaged in a fraudulent scheme to sell unregistered securities. *Id.* at 535. Notwithstanding Wallenbrock's characterization of the fraudulent investment instruments as "notes" (and therefore not "securities" within the meaning of the Securities Act), we held that the investment instruments were, for purposes of the SEC's enforcement action, "securities." *Id.* at 537. Wallenbrock was later placed in receivership and appellee James H. Donell ("the Receiver") was appointed receiver.

On August 24, 2004, Kowell and his mother received a letter from Donell. The letter informed Kowell that Wallenbrock had been declared a Ponzi scheme, and that Donell had been authorized by a federal court to recover "profits" paid to investors. The letter stated that of approximately 6,000 investors, only 800 had received payments in excess of their principal investment. The letter claimed that Kowell had invested "the sum of $ .00," and had received back payments totaling $69,546.70. Thus, Kowell had allegedly received a "profit" of $69,546.70. The letter encouraged Kowell "[t]o take advantage of this one-time offer to settle with the Receivership estate for 90% of the profit you received" by mailing a check in the amount of $62,592.03 (calculated as 90 percent of $69,546.70). The letter also required Kowell to execute an enclosed Settlement Agreement. It stated in bold letters that "it is imperative that I hear from you within 20 days from the date of this letter," or else "I will proceed accordingly."

Kowell replied by letter on August 31, 2004. Kowell stated that he had no idea Wallenbrock was a Ponzi scheme, and was in fact dubious that this was the case. Kowell expressed confusion as to how he could be liable to other investors if he had no idea Wallenbrock was a fraud. Kowell was also confused about the determination that Wallenbrock "notes" were actually securities. Kowell pointed out that Donell's letter claimed that Kowell's initial investment was "0.00," and that this must be error because Kowell had obviously made some non-zero investment in order to be eligible for returns from Wallenbrock. Finally, Kowell's letter stated that the money received in payments had been spent long ago, and if Kowell was required to pay back this amount, close to $70,000, he would have to declare bankruptcy.

Donell responded with a letter on September 22, 2004, which reiterated that Kowell was liable. The letter stated that "[t]he law in this regard goes back years and years," but notably did not cite any legal authority justifying Donell's demands. The letter also threatened:

> If you refuse to work out a settlement agreement with us, we will sue you and that will be your only option. It is not what we want for either you or your mother, however. . . . If you hire an attorney, you may certainly file a motion to bar the Receiver from collecting money from those that profited. Both the Receiver and the SEC would file objections and it would probably take about $20,000.00 in legal fees for you to file such a motion.

Kowell refused to sign the settlement agreement. By a letter dated September 27, 2004, he reiterated his utter disbelief that Wallenbrock was in fact a Ponzi scheme and his outrage that a good-faith investor in a business could be required to return his profits years later.

The Receiver filed a complaint in federal district court on November 30, 2004. The complaint sought to avoid the trans-

fers to Kowell as fraudulent and to recover property transferred under CAL. CIV. CODE §§ 3439.04(a)(1)-(2) and 3439.05. Retreating from his earlier position that Kowell was liable for $69,546.70, the Receiver now claimed he was entitled to recover $50,431.78. On motion for summary judgment, the district court found that there were no disputed issues of fact as to Kowell's liability under § 3439.04, and granted judgment for the Receiver. Applying the statute of limitations, the district court found that the receiver was only entitled to recover $26,396.10, the total of the payments to Kowell within the statutory period, plus pre judgment interest of $5,159.22. The district court made no ruling on whether Kowell would be permitted to offset his liability by the amount paid in taxes on those payments or other expenses. Kowell timely appealed.

II

[1] Although the Receiver only filed suit under a California statute, we have subject matter jurisdiction because this proceeding is ancillary to the SEC enforcement action. Wallenbrock was found liable to its investors and to the SEC under Sections 10(b) and 15(c)(1) of the Securities Exchange Act of 1934 (and related Rules 10b-5 and 15c1-2) and Sections 17(a)(1), (2), and (3) of the Securities Exchange Act of 1933. The district court, using its equity powers, appointed the Receiver to "use reasonable efforts to determine the nature, location, and value of all assets and property" belonging to Wallenbrock, "determine the identity of all investors, amounts invested by investors, and payouts to investors," and "take such action as necessary" to identify, preserve, collect, or liquidate Wallenbrock's assets. The district court authorized the Receiver to "bring such legal actions based on law or equity in any state or federal court as he deems necessary" to carry out his duties.

[2] The federal securities laws create exclusive federal jurisdiction over "all suits in equity and actions at law brought

to enforce any liability or duty created by" federal securities laws. 15 U.S.C. §§ 77v(a), 78aa. The federal district court properly authorized the Receiver to bring suits under state law in federal court under ancillary jurisdiction for the purpose of effectuating its decree of liability against Wallenbrock because the primary lawsuit against Wallenbrock presented a federal question. *See* 28 U.S.C. § 1367; Fed. R. Civ. P. 66. As the Supreme Court stated in *Peacock v. Thomas*, "we have approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments —including attachment, mandamus, garnishment, and the pre-judgment avoidance of fraudulent conveyances." 516 U.S. 349, 356 (1996); *see also Pope v. Louisville, New Albany & Chicago Ry.*, 173 U.S. 573, 577 (1899) (holding that a receiver appointed to "accomplish the ends sought and direct-ed" by a suit with a proper basis for federal jurisdiction may proceed in ancillary jurisdiction on claims with no other inde-pendent basis for federal jurisdiction); *Scholes*, 56 F.3d at 753 (holding that federal jurisdiction over a claim under the Illi-nois UFTA is based on the ancillary jurisdiction of the federal courts); *Tcherepnin v. Franz*, 485 F.2d 1251, 1255-56 (7th Cir. 1973); *Esbitt v. Dutch-American Mercantile Corp.*, 355 F.2d 141, 142-43 (2d Cir. 1964).

We review a district court's rulings on summary judgment motions *de novo*. *Agritech*, 916 F.2d at 533. California's fraudulent transfer act and the federal bankruptcy code's fraudulent transfer provisions are almost identical in form and substance; therefore, we draw upon cases interpreting both. *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir. April. 16, 2008); *Agritech*, 916 F.2d at 534.

### III

**[3]** Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of

the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers:

> The money used for the [underlying investments] came from investors gulled by fraudulent representations. [The defendant] was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and [the Ponzi scheme operator]. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment—the difference between what he put in at the beginning and what he had at the end.

*Scholes*, 56 F.3d at 757-58; *see also In re Slatkin*, 525 F.3d 805, 814-15 (9th Cir. May 6, 2008). The policy justification is ratable distribution of remaining assets among all the defrauded investors. The "winners" in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to "enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky." *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991).

Although we previously have not had occasion to prescribe an analysis for applying UFTA to allow recovery from investors in a Ponzi scheme, federal district and bankruptcy courts have adopted a largely uniform practice. In adopting this analysis, we first describe the theories of liability on which the receiver may proceed. We then describe a two-step process for determining the existence of liability and the amount of this liability.

### A

There are two theories under which a receiver may proceed under UFTA: actual fraud or constructive fraud. Under

§ 3439.04(a)(1), codifying the "actual fraud" theory, the receiver alleges that the debtor (Ponzi scheme operator) made transfers to the transferee (the winning investor) "[w]ith actual intent to hinder, delay, or defraud" the creditors (the losing investors). "[T]he mere existence of a Ponzi scheme is sufficient to establish actual intent" to defraud. *In re AFI Holding*, 525 F.3d at 704 (internal quotation marks omitted); *Agritech*, 916 F.2d at 535. Under § 3439.04(a)(2), codifying the "constructive fraud" theory, the receiver alleges that the transfer of "profits" to the winning investor was made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer," because profits gained through theft from later investors are not a reasonably equivalent exchange for the winning investor's initial investment. *See Scholes*, 56 F.3d at 757. Proof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," § 3439.04(a)(2)(A), or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due," § 3439.04(a)(2)(B).

In the context of a Ponzi scheme, whether the receiver seeks to recover from winning investors under the actual fraud or constructive fraud theories generally does not impact the amount of recovery from innocent investors. Under the actual fraud theory, the receiver may recover the entire amount paid to the winning investor, *including* amounts which could be considered "return of principal." However, there is a "good faith" defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay. *See* CAL. CIV. CODE § 3439.08(a); *Scholes*, 56 F.3d at 759; *Agritech*, 916 F.2d at 535. Under the constructive fraud theory, the receiver may only recover "profits" above the initial outlay, unless the receiver can prove a lack of good faith, in which case the receiver may *also* recover the amounts that

could be considered return of principal. CAL. CIV. CODE § 3439.08(d); *Scholes*, 56 F.3d at 757. The Seventh Circuit has suggested that the only practical distinction between these theories of recovery is the allocation of burdens of proof. *See id.* at 756-57. The parties do not dispute that Kowell acted with good faith at all times; therefore, the issue of who bears the burden of proof is not before us.[3]

## B

**[4]** Drawing from this theory, federal courts have generally followed a two-step process. First, to determine whether the investor is liable, courts use the so-called "netting rule." *See* Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 AM. BANKR. L.J. 157, 168-69 (1998) (surveying federal district court and bankruptcy cases). Amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability, and the court then determines the actual amount of liability, which may or may not be equal to the net gain, depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good faith. If the net is negative, the good faith investor is not liable because payments received in amounts less than the initial investment, being payments against the good faith losing investor's as-yet unsatisfied restitution claim against the Ponzi scheme perpetrator, are not avoidable within the meaning of UFTA.[4] *See* CAL. CIV. CODE § 3439.04(a)(2)

---

[3]Similarly, because the parties do not dispute Kowell's good faith, we need not consider the precise definition of good faith. *Cf. Agritech*, 916 F.2d at 535-36 (stating that a Ponzi scheme investor claiming good faith must meet an objective standard, and possibly prove that a diligent inquiry would not have discovered the fraudulent purpose of the transfer, but declining to determine a precise definition of good faith).

[4]Under the actual fraud theory, the good faith losing investor is technically still liable even if his net transactions are negative, because even

(holding that only payments made "[w]ithout receiving a reasonably equivalent value" are avoidable as fraudulent transfers); *United Energy*, 944 F.2d at 597 (holding there has been no fraudulent transfer to a good faith investor where a Ponzi scheme makes payments that total less than that investor's initial investment).[5]

[5] Second, to determine the actual amount of liability, the court permits good faith investors to retain payments up to the amount invested, and requires disgorgement of only the "profits" paid to them by the Ponzi scheme. *See In re Lake States Commodities, Inc.*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) (collecting cases). Payments of amounts up to the value of the initial investment are not, however, considered a "return of principal," because the initial payment is not considered a true investment. Rather, investors are permitted to retain these amounts because they have claims for restitution or recision against the debtor that operated the scheme up to the amount of the initial investment. Payments up to the amount of the initial investment are considered to be exchanged for "reasonably equivalent value," and thus not fraudulent, because they

payments that total less than the amount of that investor's initial outlay were made "[w]ith actual intent to hinder, delay, or defraud [a] creditor of the debtor." CAL. CIV. CODE § 3439.04(a)(1). However, because of the "good faith" defense, that permits an innocent investor to retain funds up to the amount of the initial outlay, CAL. CIV. CODE § 3439.08(a), the good faith investor with a net loss will not face any actual liability.

[5]The application of the netting rule may be more complex in a case where the relationship between the investor and the Ponzi scheme perpetrator changes over time. *See, e.g.*, *In re Lake States Commodities*, *Inc.*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) (considering whether to permit netting of transactions from a period in which the defendant undisputably acted in good faith with transactions from a later period during which the defendant may have come to learn of the Ponzi scheme and then continued to invest, while lacking good faith, to keep the scheme afloat). The parties here do not dispute that Kowell acted with good faith at all times; we express no opinion on the application of the netting rule in more complex cases.

proportionally reduce the investors' rights to restitution. *United Energy*, 944 F.2d at 595. If investors receive more than they invested, "[p]ayments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity." *Lake States*, 253 B.R. at 872.

Although all payments of fictitious profits are avoidable as fraudulent transfers, the appropriate statute of limitations restricts the payments the Ponzi scheme investor may be required to disgorge. Only transfers made within the limitations period are avoidable. *Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1131 (D. Ariz. 2006) (holding that a court-appointed receiver could not base his claims under Arizona's UFTA on transfers that took place outside of the limitations period); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1145-46 (C.D. Cal. 2003) (holding that plaintiffs could prevail if they could prove at trial that certain transfers made pursuant to a Ponzi scheme were made within the limitations period of California's UFTA). Once the district court has identified the avoidable transfers, it has the discretion to permit the receiver to recover pre-judgment interest on the fraudulent transfers from the date each transfer was made. *In re Slatkin*, 525 F.3d at 820; *Agritech*, 916 F.2d at 541-42. "[P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money." *In re P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir. 1998).

IV

A

**[6]** The district court applied the analysis described above. The Receiver filed suit against Kowell under both § 3439.04(a)(1) (actual fraud) and § 3439.04(a)(2) (constructive fraud). The claim under § 3439.04(a)(1) alleged that "[t]he payments made to Kowell by Wallenbrock were made

with the actual intent to hinder, delay or defraud Wallenbrock's Noteholders," now the "creditors of Wallenbrock." The claim under § 3439.04(a)(2) alleged that "[t]he payments made to Kowell in excess of Kowell's Principal Investment were made without Kowell giving a reasonably equivalent value to Wallenbrock in exchange for the payments." The district court did not indicate under which theory it granted summary judgment for the Receiver, although it cited "actual fraud" cases. *See In re Cohen*, 199 B.R. 709, 717 (9th Cir. B.A.P. 1996); *In re Slatkin*, 310 B.R. 740, 748-49 (C.D. Cal. 2004). Because Kowell's good faith was not disputed, the district court could have granted summary judgment on either ground. There was no triable issue of fact that Wallenbrock was a Ponzi scheme, *see Wallenbrock*, 313 F.3d 532, or that payments made in furtherance of that scheme were fraudulent transfers. *See In re AFI Holdings*, 525 F.3d at 703-04.

The district court, to determine Kowell's liability, netted the amount Kowell received from Wallenbrock against his initial investment, finding that Kowell invested $22,858.92 and received $73,290.70, for a net profit of $50,431.78. In the alternative, the court noted that Kowell had admitted in his own interrogatory answer that he paid taxes on approximately $50,000 in profits, which was sufficient to establish a net gain for purposes of proving liability under § 3439.04.

[7] Kowell argues that the district court erred in admitting the declaration and report of Samuel Biggs, the Receiver's accounting expert, to prove that Kowell netted $50,431.78, because the declaration and report lacked foundation. Kowell's claim fails because the declaration satisfies the requirements for foundation and expert opinion. *See* FED. R. EVID. 703, 705. Samuel Biggs is a certified public accountant, and his declaration and report were based on accounting records held by Wells Fargo Bank and one of the scheme perpetrators. More importantly, any error in admitting the Biggs declaration would have been harmless, because Kowell admitted in his own interrogatory that he received approximately

$50,000 in net profits. The netting rule is used not to determine the amount of liability but rather the existence of liability; it requires only a positive net transaction with the Ponzi scheme. Thus, Kowell's admission that he netted $50,000 was sufficient to establish the existence of liability under § 3439.04.

[8] The district court properly limited the Receiver's recovery to amounts transferred to Kowell within the statutory period. California's UFTA has its own associated statute of limitations. CAL. CIV. CODE § 3439.09. An action under § 3439.04(a)(1), for actual fraud, must be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." CAL. CIV. CODE § 3439.09(a). An action under § 3439.04(a)(2), for constructive fraud, must be brought within four years after the transfer was made. CAL. CIV. CODE § 3439.09(b). The Receiver filed suit on November 30, 2004. The district court found Kowell liable only for payments received on December 20, 2000, June 19, 2001, and September 19, 2001, totaling $26,396.10. Thus, although Kowell actually netted $50,431.78 in total, the district court entered judgment for $26,396.10, plus pre-judgment interest.

[9] Kowell argues that the district court should have required the Receiver to trace the transfers and demonstrate whether the three payments within the statutory period were return of principal or profit. He argues that if some of the transfers from within the statutory period were returns of the principal which Kowell invested *before* the statutory period, these transfers would also fall outside of the statute of limitations. Kowell's proposed tracing requirement is unsupported by law and would be unmanageable in practice. We decline to require such tracing. As with the netting rule:

> [T]he trustee need not match up each investment
> with each payment made by the debtor and follow

the parties' characterizations of the transfers. This may be the only workable rule in the typical Ponzi-scheme case, where documentation of transfers is less than complete, payments are sporadic and not always in accordance with the documentation of the investment, and neither the investor nor the debtor can recall precisely what the parties intended.

*Lake States*, 253 B.R. at 872 (citation omitted). The district court may presume that the earliest payments received by the investor are payments against the investor's claim for restitution. Transfers in excess of that amount, made within the statute of limitations, are avoidable as fraudulent conveyances.

## B

Kowell offers several theories as to why we should not permit courts to require innocent investors to disgorge net profits from a Ponzi scheme under UFTA. We address each in turn.

### 1

First, Kowell argues that UFTA was never intended to apply to innocent investors in a Ponzi scheme. To support his argument, he challenges that the text of the statute covers transfers between "debtors" and "creditors," not between early investors and later investors in the same enterprise. In the same vein, he argues that if all the investors in the scheme are "creditors" under UFTA, he should be considered a creditor as well, and not, as the receiver argues, a "transferee." In other words, Kowell argues that application of UFTA in the wake of a Ponzi scheme seems to necessitate that all investors in the scheme be deemed "creditors" but only some are deemed "transferees," but that nothing in the text of the statute dictates this result.

**[10]** Kowell's claim fails because the terms of the statute are abstract in order to protect defrauded creditors, no matter

what form a Ponzi scheme or other financial fraud might take. *See Agritech*, 916 F.2d at 534 (describing UFTA as one of "two overlapping bodies of law applicable to [a collapsed Ponzi scheme] which permit the trustee to recover"); *Lake States*, 253 B.R. at 871-872 (discussing numerous cases applying UFTA in the wake of a collapsed Ponzi scheme). Laws governing fraudulent transfer have existed for centuries, as codified (in terms remarkably similar to the current version of § 3439.04) in the Statute of 13 Elizabeth I. *See* An Act Against Fraudulent Deeds, Gifts, and Alienations, 1571, 13 Eliz. c.5, s.2 (avoiding conveyances made with the "Purpose and Intent to delaye hynder or defraude Creditors"). In construing this early codification, an English court noted, "And because fraud and deceit abound in these days more than in former times, it was resolved in this case by the whole Court, that all statutes made against fraud should be liberally and beneficially expounded to suppress the fraud." *Twyne's Case*, 76 Eng. Rep. 809, 815 (1601) (Star Chamber).

**[11]** In this case, we need not construe the terms particularly broadly in order to see that they apply quite clearly to Kowell. As we discussed above, when Kowell and the other innocent victims gave money to Wallenbrock, they were not actually investors, but rather tort creditors with a fraud claim for restitution equal to the amount they gave. *See United Energy*, 944 F.2d at 595. At that point, Wallenbrock was in fact a "debtor," and Kowell and all other innocent investors were "creditors." *See* CAL. CIV. CODE § 3439.04(a). Wallenbrock then began making payments to Kowell, not because Kowell's money had actually been profitably invested, but because Wallenbrock had the "actual intent to hinder, delay, or defraud [the other tort] creditor[s]," i.e., the later victims of the scheme. CAL. CIV. CODE § 3439.04(a)(1). At the point at which the payments to Kowell exceeded the amount of Kowell's claim for restitution, Kowell was no longer a creditor of Wallenbrock. His initial, fraudulently obtained payment had been restored. Thus, Kowell is incorrect when he argues that all innocent investors are similarly situated, and that if the

losing investors are "creditors," then so is he. Once Kowell has regained his initial "investment," he is no longer a creditor—his claim has been repaid. The other victims who did not receive payments in excess of the initial amount they were fraudulently induced to put into the scheme are the "creditors" that UFTA protects.

2

**[12]** Second, Kowell argues that the federal securities laws preempt UFTA, and therefore, because the Wallenbrock "notes" have been deemed securities, the Receiver may only sue him for securities fraud, not for restitution as the recipient of a fraudulent transfer. Federal preemption may be express or implied. *See Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). Kowell does not cite to any provision of federal securities laws that would demonstrate express preemption of state uniform fraudulent transfer law. Federal preemption may be implied through "conflict preemption," when a state law actually conflicts with, or poses an obstacle to the accomplishment of the purposes of, a federal law, or "field preemption," when a federal law so thoroughly occupies a legislative field that there is no room for state action in that area. *See id*. Kowell does not suggest how the federal securities laws might conflict with, pose an obstacle to, or occupy the field of, state fraudulent transfer laws.[6] To the contrary, federal securities law expressly creates exclusive federal jurisdiction to permit enforcement of "*any* liability or duty" created by the Securities Act through "*all* suits in equity and actions at law" that may prove effective. 15 U.S.C. § 78aa (emphasis added).

---

[6]Kowell's reliance on *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), and *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005), is misplaced. *Lampf* held that a private cause of action implied under Rule 10b-5 of the Securities Act must be brought under the Act's statute of limitation. 501 U.S. at 359. Preemption was not implicated. *Livid Holdings* addressed the effects of the Sarbanes-Oxley Act on *Lampf*. 416 F.3d at 950.

**[13]** UFTA permits a receiver or trustee to further the purpose of many securities laws by providing recourse to defrauded debtors.[7] The fact that the initial perpetrator may have been found guilty for securities fraud does not mandate that actions brought against other participants sound in securities fraud. The actions against participants like Kowell are brought to "enforce [a] liability or duty" created by the securities laws.[8]

3

**[14]** Third, Kowell argues that it is inequitable to apply UFTA to recover profits he received because he was an innocent victim of the Wallenbrock scheme, just like those whom UFTA purports to protect. We are aware that it may create a significant hardship when an innocent investor such as Kowell is informed that he must disgorge profits he earned innocently, often years after the money has been received and spent.[9] Nevertheless, courts have long held that is more equi-

---

[7]Although in this case bankruptcy proceedings were not initiated, a common epilogue to a collapsed Ponzi scheme is a bankruptcy proceeding. Once in bankruptcy, federal law authorizes the trustee to bring suit under both applicable state law and also the fraudulent transfer provision of the bankruptcy code. *See* 11 U.S.C. § 548 (the federal fraudulent transfer provision); 11 U.S.C. § 544(b) (authorizing the trustee to recover fraudulent transfers under § 548 and also applicable state law); *United Energy*, 944 F.2d at 593-594 (applying both federal law and California's UFTA). Thus, not only do federal securities laws not preempt UFTA, but federal bankruptcy law expressly permits actions under UFTA. 11 U.S.C. § 544(b).

[8]For the same reasons, we reject Kowell's argument that the statute of limitations found in the securities laws applies to his case. The fact that Wallenbrock was found guilty of securities fraud, aside from supporting federal jurisdiction in this ancillary proceeding, has no bearing on the case. The Receiver brought suit under California Civil Code § 3439.04, and that statute expressly provides a limitations period. CAL. CIV. CODE § 3439.09.

[9]The hardship visited on innocent investors who are later required to disgorge their profits has been widely reported as yet another common tragic result of a Ponzi scheme. *See, e.g.*, E. Scott Reckard, *You Won, Now Give it Back*, L.A. TIMES, May 20, 2004, at A1.

table to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell. *See Scholes*, 56 F.3d at 757 ("[I]t may seem 'only fair' that [the early investor] should be entitled to the profits . . . made with his money. . . . [However, h]e should not be permitted to benefit from a fraud at [later investors'] expense merely because he was not himself to blame for the fraud.").

Moreover, pursuant to UFTA, the Receiver is only entitled to recovery of the amounts above Kowell's initial investment transferred within the limitations period. Thus, the statute protects Kowell in two ways. It allows him to keep the full amount of his original investment, *see Scholes*, 56 F.3d at 757, and it shields those "profits" paid to Kowell for which the statute of limitations has run. According to the Receiver, in this case approximately 6,000 investors participated in the *Wallenbrock* Ponzi scheme, but only about 800 received back more than their initial investment. It is likely that many of the other 5,200 losing investors will see only a portion of their initial investment returned. *See* McDermott, *supra*, at 157-159 (explaining that assets recovered after a collapsed Ponzi scheme typically are insufficient to satisfy claims by defrauded investors). We see nothing inequitable in the effort to mitigate the losses suffered by other innocent investors.

4

**[15]** Fourth, Kowell argues that the Receiver does not have standing to bring this action against him. Ordinarily, he points out, a debtor does not have standing to avoid his own transactions. Similarly, he claims that the Receiver cannot represent the interests of all of the investors because Kowell himself is an investor as much as any other and yet his interests are adverse to those of the Receiver. The Seventh Circuit confronted similar arguments in *Scholes*, in which the defendants (winning investors) argued that the receiver did not have standing to sue them because he was "really" suing on behalf

of the losing investors, as opposed to the corporation. 56 F.3d at 753. Under bankruptcy law, they argued, "a receiver does not have standing to sue on behalf of the creditors of the entity in receivership. Like a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue only to redress injuries to the entity in receivership. . . ." *Id.*

*Scholes* held that, during the operation of the scheme, the corporations created by the scheme operator were "robotic tools" of the operator, but nonetheless separate legal entities in the eyes of the law that were forced (by the operator) to pay out funds to early investors instead of using the corporation's funds for legitimate investments. *Id.* at 754. Once the scheme collapsed, "[t]he appointment of the receiver removed the wrongdoer from the scene. The corporations were no more [the operator's] evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of [the operator] but of innnocent investors—that [the operator] had made the corporations divert to unauthorized purposes." *Id.* We agree with the Seventh Circuit's colorful analysis. The Receiver has standing to bring this suit because, although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that Wallenbrock suffered when its managers caused Wallenbrock to commit waste and fraud.

5

**[16]** Fifth, Kowell argues that even if UFTA applies to this case, he should not be found liable because his initial investment provided "reasonably equivalent value" in exchange for the profits he earned in the scheme. *See* CAL. CIV. CODE § 3439.04(a)(2). Despite the intuitive appeal of Kowell's argument, we reject it by considering the economic exchange in a Ponzi scheme.

UFTA identifies an avoidable transfer as one made "[w]ithout receiving a reasonably equivalent value in

exchange." CAL. CIV. CODE § 3439.04(a)(2). Unlike contract law, which requires only that "adequate" consideration be given, UFTA requires that, to escape avoidance, a transfer have been made for "reasonably equivalent value." The purpose is not to identify binding agreements, but to identify transfers made with no rational purpose except to avoid creditors. *See Scholes*, 56 F.3d at 756.

Payouts of "profits" made by Ponzi scheme operators are not payments of return on investment from an actual business venture. Rather, they are payments that deplete the assets of the scheme operator for the purpose of creating the appearance of a profitable business venture. *Id*. at 756-57. The appearance of a profitable business venture is used to convince early investors to "roll over" their investment instead of withdrawing it, and to convince new investors that the promised returns are guaranteed. *Cf. Agritech*, 916 F.2d at 537 ("[Defendant's] demand for payment explicitly stated that the payment would induce other investors to transfer funds into new partnerships [Defendant] was syndicating."). Up to the amount that "profit" payments return the innocent investor's initial outlay, these payments are settlements against the defrauded investor's restitution claim. Up to this amount, therefore, there is an exchange of "reasonably equivalent value" for the defrauded investor's outlay. Amounts above this, however, are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business. These amounts are not a "reasonably equivalent" exchange for the defrauded investor's initial outlay.

In this case, Kowell never actually possessed an interest in a company purchasing account receivables from Malaysian glove manufacturers. The investment strategy promised by Wallenbrock's officers was a lie to induce Kowell and investors like him to fund Wallenbrock. What Wallenbrock did was return to Kowell his own money, plus money from subsequent "investors," to persuade Kowell to continue to invest and to

secure testimonial evidence from people like Kowell to induce others to invest. Although Kowell was putting real money into Wallenbrock, and was getting what looked like real profits in return, in fact he never received "reasonably equivalent value" for his investment, just cash that was moved around in an elaborate shell game.

V

Kowell argues that even if he is liable to return amounts in excess of his initial outlay, he should be permitted to offset this liability by amounts paid as income taxes on those gains, bank transfer fees, and other expenses. Kowell argues that unless these offsets are permitted, he will be forced to pay back more money than he actually netted from his participation in the scheme. He argues that UFTA should not be applied so as to aid other investors in recovering the full amount of their outlay by forcing Kowell to retain less than the full amount of his outlay. Kowell cites no authority to support his position. The cases cited by the Receiver, however, do not guide us to the contrary conclusion.

In *In re Tiger Petroleum Company*, the trustee attempted to classify certain "investors" who did not actually receive payments for amounts greater than their initial investments liable as net-gain investors under the netting rule through the novel argument that tax benefits those investors received due to participation in the scheme should be added into the calculation of their gains. 319 B.R. 225, 238-39 (Bankr. N.D. Okla. 2004). The bankruptcy court rejected the trustee's argument because adopting it might lead to inequitable results, and could also require courts to consider even more creative claims as to what "value" investors received. *Id.* Also, tax benefits were transfers of value from the federal government, not from the debtor. *Id. In re Tiger Petroleum* says nothing about whether an innocent winning investor may offset his liability under UFTA for amounts that have been used in good faith to pay income taxes on his gains.

The Receiver also quotes *In re Acequia, Inc.* for the proposition that "[a] fraudulent conveyance cannot be offset against or exchanged for a general unsecured claim." 34 F.3d 800, 817 (9th Cir. 1994) (internal quotation and citation omitted). This quote is taken out of context. In *In re Acequia*, we stated that a fraudulent conveyance cannot be offset against a general unsecured claim *against the debtor*. In other words, under *In re Acequia*, an investor like Kowell could not offset his liability to the Receiver for amounts in excess of his initial outlay with an alleged claim against Wallenbrock. The principle behind this is apparent: permitting each winning investor to offset his profits by a claim against the debtor would defeat UFTA entirely. *Id.* ("It would defeat the purpose of the Bankruptcy Act's provisions relating to fraudulent transfers to allow [creditors] to offset the value of the property thus transferred to them by the amount of their unsecured claim against [the debtor]." (internal quotations and citation omitted) (alterations in original)). This case says nothing about whether an innocent winning investor may seek an offset against his liability to the receiver for amounts paid in good faith as taxes on his gains.

**[17]** Kowell's argument does merit consideration. The purpose of UFTA is to permit the receiver to collect those assets that can actually be located and recovered in the wake of a Ponzi scheme, and to ratably distribute those assets among all participants, including the many investors who lost everything. UFTA accomplishes this by requiring good faith participants to disgorge their gains and permitting them keep the full amount of their initial investment. *See Scholes*, 56 F.3d at 757-58. Prohibiting good faith investors from claiming offsets for amounts that were paid in good faith as taxes will mean that some investors, like Kowell, will actually not be permitted to retain the full amount of their investment. Kowell argues this exceeds the policy goal of UFTA.

**[18]** Nevertheless, three factors lead us to decline to permit good faith investors to claim offsets for taxes or other

expenses paid in connection with receipt and management of income from a Ponzi scheme. First, as Kowell's argument suggests, if we permit offsets for taxes, logic suggests we should also permit offsets for bank transfer fees and other fund management fees. There would also be no reason to prohibit offsets for the other countless expenses Kowell has incurred. There is simply no principle by which to limit such offsets; one could argue that every purchase made with the gains from the scheme would not have been made "but for" receipt of that money. If each net winner could shield his gains in their entirety in this manner, the purpose of UFTA would be defeated, and the multitude of victims who lost their entire investment would receive no recovery.

Second, even if we could limit permissible offsets to a few areas such as taxes paid, this would introduce complex problems of proof and tracing into each case. This would severely reduce the receiver's ability to effectively gather what few assets can be located in the wake of a failed Ponzi scheme. In addition, were we to adopt a tax offset, the amount of the offset would depend on Kowell's tax bracket. Thus, two Wallenbrock investors, having made identical payments and having received identical returns, might receive different tax offsets because of their other financial decisions. Third, we cannot discern the equity in permitting an offset here, when any tax-paid credit offered to Kowell must come at the expense of other Wallenbrock investors. The Internal Revenue Service is not a party to this suit, and the disappointed investors have no cause of action to recover those monies from the IRS.

[19] We thus decline to start down a path we do not recognize. There is no basis in UFTA for Kowell's offset. Accordingly, Kowell is not entitled in this action to offset his liability to the Receiver by the taxes (or other expenses) he paid on his Wallenbrock "profits." If Kowell believes he overpaid his taxes for the years he received Wallenbrock "profits," he may wish to pursue his remedies with the IRS.

## VI

Ponzi schemes leave no true winners once the scheme collapses—even the winners were defrauded, because their returns were illusory. Those who receive gains from innocent participation in the scheme may be required to disgorge those amounts, long after the money has been spent. Addressing the victims of the original Ponzi scheme, the Supreme Court commented that "[i]t is a case the circumstances of which call strongly for the principle that equality is equity." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924). In this case, then, equity compels that Kowell share some of the hardship equally with those who lost their initial investment.

California's Uniform Fraudulent Transfer Act has treated Kowell fairly. Indeed, Kowell actually benefitted from the equitable concerns embodied in UFTA. Kowell "invested" $22,858.92 into the scheme; Wallenbrock made payments to Kowell (including the return of his initial "investment") totaling $73,290.70. The Receiver's original demand letter inaccurately informed Kowell that he owed $69,546.70, and tried to pressure him to mail a check for 90 percent of that amount, or $62,592.03, within 20 days or face consequences. Because Kowell did not succumb to these tactics and instead sought protection in federal court, the Receiver was forced to concede that Kowell netted only $50,431.78. Further, the applicable statute of limitations limited Kowell's actual liability to $26,396.10, plus pre-judgment interest of $5,159.22, for a total liability of $31,555.32.

Thus, comparing the total he received, $73,290.70, with the amount he must return, $31,555.32, shows that Kowell will be permitted to retain $41,735.38 of the monies Wallenbrock paid him—for a net gain of $18,876.46 on his initial investment of $22,858.92 (calculated as $41,735.38 − $22,858.92). This represents a total return of approximately 83 percent on his investment, or, an annualized return, over the period of investment from 1997 to 2001, of approximately 16 percent.

Most of the scheme's 5,200 net losers are likely to recover only pennies on the dollar of their initial investment.

The judgment is **AFFIRMED**.