NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: PROFESSIONAL FINANCIAL INVESTORS, INC., Debtor. | BAP No. NC-23-1171-SGF |
| | Bk. No. 20-30604 |
| | Adv. No. 22-03058 |
| RICHARD MCAVOY; KATHRYN MCAVOY, Appellants, v. MICHAEL GOLDBERG, Trustee of the PFI Trust, Appellee. | MEMORANDUM* |

Appeal from the United States Bankruptcy Court
for the Northern District of California
Hannah L. Blumenstiel, Bankruptcy Judge, Presiding

Before: SPRAKER, GAN, and FARIS, Bankruptcy Judges.

## INTRODUCTION

Richard and Kathryn McAvoy appeal from the bankruptcy court's summary judgment in favor of Michael Goldberg, as trustee of the PFI Trust. The bankruptcy court determined as a matter of undisputed fact and

---

*This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

law that the McAvoys were liable under Cal. Civ. Code § 3439.04(a)(1) and (2) for $323,397.30 in "fictitious profits" they received from debtor Professional Financial Investors, Inc. ("PFI") and its affiliates, who were running a massive Ponzi scheme.

Using an alternative methodology for calculating the amount of their fraudulent transfer liability, the McAvoys assert that their liability should have been zero. But their methodology is inconsistent with binding Ninth Circuit law. They also complain that the bankruptcy court should have excluded as inadmissible a declaration submitted in support of Goldberg's summary judgment motion. But the contents of this declaration were cumulative of other evidence in the record.

Because neither of the McAvoys' arguments justifies reversal, we AFFIRM.

## FACTS[1]

### A. The Debtors, their bankruptcy filings, and the formal Ponzi scheme determination.

The underlying bankruptcy case is one of many arising from a massive Ponzi scheme orchestrated by Ken Casey and Lewis Wallach through debtors PFI and Professional Investors Security Fund, Inc. ("PISF"). When a group of investors discovered the Ponzi scheme, they

---

[1] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case and adversary proceeding. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

filed an involuntary chapter 11[2] petition against PISF in July 2020. Shortly thereafter, PISF consented to entry of an order for relief, and PFI filed a voluntary petition. Eventually, virtually all of PFI's and PISF's affiliates became debtors as well (collectively with PFI and PISF, the "Debtors").

In April 2021, the official committee of unsecured creditors filed a complaint for declaratory relief seeking a determination that the Debtors had been operating a Ponzi scheme. A month later, the bankruptcy court entered a stipulated judgment formally determining that Debtors' "businesses were all part of an overarching Ponzi scheme that began no later than January 1, 2007."

**B.    Plan confirmation and Goldberg's commencement of avoidable transfer litigation.**

In November 2021, the bankruptcy court confirmed the modified second amended joint chapter 11 plan proposed by the Debtors and the official committee of unsecured creditors ("Plan"). The Plan appointed Goldberg to serve as trustee of the "PFI Trust" and authorized him to pursue avoidance actions on its behalf. With the assistance of FTI Consulting, Inc. ("FTI"), Goldberg ascertained whether each investor who invested in the Debtors received a net negative or net positive return on their investment. The "Net Losers" were entitled to a restitution claim for

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

the balance of their investment, which the Plan converted into interests in the PFI Trust. The "Net Winners" were subject to being sued by Goldberg for avoidance and recovery of their "Fictitious Profits" in excess of the balance of their investment.

In July 2022, Goldberg commenced sixty-seven separate adversary proceedings against Net Winners, including the McAvoys. Goldberg's complaint against the McAvoys stated four avoidance claims for relief— two under § 548(a)(1)(A) and (B) and two under Cal. Civ. Code § 3439.04(a)(1) and (2). The complaint also stated a claim for relief for unjust enrichment.

## C. The McAvoys' summary judgment motions.

In March 2023, the McAvoys moved for summary judgment. They asserted that the claims were time barred and the unjust enrichment claim was facially invalid. In April 2023, the bankruptcy court approved the parties' stipulation granting the McAvoys summary judgment on Goldberg's two § 548 claims and on his unjust enrichment claim. As for the two remaining avoidable transfer claims under California law, the court denied the motion.

In July 2023, the McAvoys again moved for summary judgment, claiming that their avoidable transfer liability was zero. In support of this argument they submitted a forensic accounting prepared by FTI on Goldberg's behalf detailing four separate Debtor accounts held in the McAvoys' names ("FTI Report"). According to the McAvoys, facts

4

sufficient to authenticate the FTI Report were obtained during the McAvoys' deposition of Goldberg. More specifically, the McAvoys submitted deposition transcript excerpts with their second summary judgment motion, in which Goldberg testified that Deposition Exhibit "L" —the FTI Report—was a report for the McAvoys' accounts with the Debtors FTI prepared showing transfers in and transfers out of the McAvoys' accounts and was part of FTI's larger, global forensic accounting of the Debtors' finances.

The FTI Report included a one-page "Schedule A: Summary of Clawback Liability" and a nine-page "Schedule B1: Detailed Report of Account Activity." For the McAvoys' four accounts, Schedule A showed total cash in of $940,628.08 and total cash out of $1,392,784.23. Thus, Schedule A reflected that the McAvoys recovered $452,157.15 over and above their total investment. In turn, Schedule B1 showed the total transfers out of the McAvoys' accounts during the seven-year avoidable transfer limitations period, beginning on July 26, 2013 and ending on July 26, 2020. The net total received by the McAvoys within this period was $323,397.30.

Critically, the McAvoys did not challenge the authenticity or accuracy of the FTI Report. Nor did they dispute the specific amounts it detailed as transferred into and out of the McAvoys' accounts with the Debtors. To the contrary, the McAvoys relied on the FTI Report to support their arguments regarding the dates and amounts of transfers into and out

5

of their accounts with the Debtors. For example, using the FTI Report's transfer amounts and transfer dates for Account Nos. 1000723 and 300112, the McAvoys claimed that none of the amounts transferred out of these accounts should be considered in figuring their potential avoidable transfer liability because all transfers out of these two accounts occurred before July 26, 2013, the earliest date within the applicable period for avoidance claims under California law. At the same time (again using the FTI Report's amounts), they claimed that the aggregate amount of "starting balances" deposited into these two accounts ($344,620.44) should offset any potential avoidable transfer liability arising from their other two accounts (Account Nos. 1001915 and 3000110).

They then calculated their potential avoidable transfer liability with respect to the two accounts that existed during at least part of the avoidable transfer period—Account Nos. 1001915 and 3000110. Again, using dates and amounts from the FTI Report, they asserted that their maximum potential liability from Account No. 1001915 was $141,213.49, and their maximum potential liability from Account No. 3000110 was $63,109.67, for an aggregate maximum potential liability of $204,323.16. Given their alleged right to offset up to $344,620.44 they deposited into Account Nos. 1000723 and 300112, they claimed that their actual avoidable transfer liability was zero. The McAvoys offered no evidence other than the FTI Report to establish the dates and amounts of transfers into and out of their accounts with the Debtors.

Goldberg opposed the McAvoys' second summary judgment motion. He pointed out that the McAvoys had not disputed the FTI Report. Instead, as Goldberg noted, the McAvoys had used the FTI Report's transfer dates and amounts to calculate their avoidable transfer liability—but did so in a manner inconsistent with binding Ninth Circuit case law. As part of this argument, Goldberg relied on the exact same FTI Report that the McAvoys had relied on. Goldberg's copy of the FTI Report was attached as Exhibit "2" to the declaration of his counsel Christopher D. Sullivan filed in support of Goldberg's summary judgment opposition ("First Sullivan Declaration"). The declaration additionally summarized the FTI Report's contents. It also included as a separate exhibit—Exhibit "1"—a copy of the declaration of FTI senior managing director Michelle Herman ("Herman Declaration"). She explained how FTI for each investor accounted for their cash transfers into and out of the Debtors.

As Goldberg explained, the FTI Report established that the McAvoys were Net Winners in the amount of $452,157.15 based on their transactions between January 1, 2007 and July 26, 2020. However, Goldberg limited his damages for the avoidable transfers under the applicable statute of limitations to $323,397.30, calculated on those amounts transferred out of the McAvoys' accounts between July 26, 2013 and July 26, 2020. Citing *Donell v. Kowell*, 533 F.3d 762, 772-73 (9th Cir. 2008), Goldberg insisted that his method of calculating the McAvoys' liability was consistent with Ninth Circuit law and the McAvoys' was not.

The McAvoys did not file a reply in support of their second summary judgment motion. Nor did they object to any of the evidence presented with Goldberg's summary judgment opposition (including the First Sullivan Declaration, the Herman Declaration, and the FTI Report).

On August 25, 2023, the bankruptcy court issued a written tentative ruling ("First Tentative Ruling"). Initially, the court acknowledged the Debtors' Ponzi scheme and the "more than $300 million in investor funds [that] had been lost." The court noted FTI's role in assisting Goldberg in analyzing individual investor accounts and determining which investors had received a net positive return on their investments. The court then concluded that the existence of the Debtors' Ponzi scheme was sufficient to establish actual fraudulent transfers to the Net Winners under Cal. Civ. Code § 3439.04(a)(1) and constructive fraudulent transfers to the Net Winners under Cal. Civ. Code § 3439.04(a)(2). It also held that the McAvoys' good faith was not a complete defense in the context of a Ponzi scheme but rather limited Goldberg's recovery to the McAvoys' Fictitious Profits, which were to be calculated by "netting" the aggregate amount they paid into the Ponzi scheme against the total amount they received. Any recovery against a Net Winner, therefore, was limited to the amounts in excess of the "initial investment," but further capped to those excess amounts received within the applicable statute of limitations period.

The court then rejected the McAvoys' calculation of their (non)liability. As the court explained, their calculation was inconsistent

8

with the Ninth Circuit's methodology for calculating Ponzi scheme avoidable transfer liability and factually meritless because it incorrectly assumed that Goldberg's calculation failed to account for money rolled over from the two accounts that were closed in 2010 (Account Nos. 1000723 and 3000112).

But the bankruptcy court did not stop there. Relying on the FTI Report, the court stated that the McAvoys paid into the Ponzi scheme a total of $940,628.00 and received $1,392,785.23, for a total net profit of $452,157.15. Again relying on the FTI Report, the court then calculated the total cash transferred out of the McAvoys' accounts within the applicable limitations period to be $323,397.30, and stated that their liability was capped at that amount. The court later reiterated that this was "the amount Mr. Goldberg may recover."

Importantly, the court observed that the McAvoys had not challenged the accuracy of the transfer dates and amounts in the FTI Report supporting the identical calculations made by the court and Goldberg to reach an identical liability amount of $323,397.30.

The First Tentative Ruling advised the parties that the court was inclined to deny the McAvoys' second summary judgment motion and gave the parties until August 30, 2023, to inform the court whether or not they accepted the First Tentative Ruling. After both parties accepted the tentative ruling, the court entered a Docket Text Order denying the second summary judgment motion "for the reasons stated in the tentative ruling."

**D. Goldberg's summary judgment motion.**

Within a week of the Docket Text Order, Goldberg moved for summary judgment. Goldberg relied on the stipulated judgment entered in the creditors committee's declaratory relief action to establish the existence of the Debtors' Ponzi scheme. He also relied on the same FTI Report and calculations to establish that the McAvoys were Net Winners who should be ordered to disgorge $323,397.30 in Fictitious Profits they received between July 26, 2013 and PFI's petition date of July 26, 2020.

To further support his summary judgment motion, Goldberg included a "new" declaration from his counsel Christopher D. Sullivan ("Second Sullivan Declaration"). The Second Sullivan Declaration was new in the sense that it contained one new paragraph and one slightly altered paragraph that were not part of the First Sullivan Declaration. The newly added and amended paragraphs are largely immaterial to our resolution of this appeal. But Exhibits "1" and "2" to the Second Sullivan Declaration (the Herman Declaration and the FTI Report) were identical to Exhibits "1" and "2" attached to the First Sullivan Declaration.

The McAvoys opposed Goldberg's summary judgment motion and objected to the Second Sullivan Declaration. They claimed that Sullivan lacked personal knowledge to authenticate the previously authenticated FTI Report. They further pointed out that the Herman Declaration attached as Exhibit "1" to the Second Sullivan Declaration similarly could not authenticate the FTR Report attached as Exhibit "2" to the Second Sullivan

10

Declaration. The McAvoys also objected to the Second Sullivan Declaration as, in part, presenting inadmissible lay opinion testimony in violation of Federal Rules of Evidence 701 and 702 to the extent it described FTI's methodology for calculating the McAvoys' fraudulent transfer liability. Additionally, the McAvoys claimed that paragraphs 4, 7, and 8 of the Second Sullivan Declaration were inadmissible hearsay.

The McAvoys then reiterated their calculations and analysis from their second summary judgment motion (again relying on the FTI Report), which led them to conclude that they had zero liability for fraudulent transfers. They also asserted that there remained triable issues of fact regarding amounts deposited before the period covered by FTI's netting analysis (which covered between 2007 and 2020), the specific timing of such deposits, and the McAvoys' motivation or purpose for making such deposits.

Goldberg filed a reply in support of his summary judgment motion. He argued that the McAvoys' evidentiary objections were baseless because they presented the FTI Report in support of their second summary judgment motion and admitted its authenticity and admissibility for summary judgment purposes. He noted that, based on this admission and all parties' factual reliance on the FTI Report, the court concluded that the McAvoys were Net Winners in the amount of $452,157.15 and were subject to disgorging $323,397.30 in Fictitious Profits. Using the correct methodology as recognized in *Donnell* for calculating the McAvoys'

fraudulent transfer liability, Goldberg contended that as matter of law the McAvoys were liable for $323,397.30, and their claimed genuine issues of material fact were irrelevant under the binding *Donnell* methodology.[3]

On October 2, 2023, the bankruptcy court issued a new tentative ruling expressing its inclination to grant Goldberg's summary judgment motion ("Second Tentative Ruling"). The vast majority of this ruling referenced the same undisputed facts and reiterated the same analysis set forth in the First Tentative Ruling. In relevant part, the court specifically noted that in its First Tentative Ruling, "the court determined that the McAvoys are liable for Fictitious Profits during the Relevant Period in the amount of $323,397.30." The court explained that it previously had rejected the McAvoys' calculation of their liability and their claim that there were triable issues of fact regarding the amount of its liability. As the court stated, "[t]he court will not repeat itself or afford the McAvoys a second bite at this apple, particularly where they accepted the court's rationale as set forth in the [First] Tentative Ruling and as incorporated into the court's order denying the Prior MSJ."

As for the McAvoys' evidentiary objections, the court deemed them

---

[3] The McAvoys filed a three-page surreply in support of their summary judgment opposition. They claimed that Goldberg's reply impermissibly attempted to reference "new evidence" in the form of materials submitted in support of the McAvoys' second summary judgment motion that were not mentioned in Goldberg's initial moving papers. The bankruptcy court struck the surreply as an unauthorized filing.

"waived." According to the court, the McAvoys' failure to object to the First Sullivan Declaration and their reliance on, and prior authentication of, the FTI Report waived their evidentiary objections to the Second Sullivan Declaration.

After holding a hearing at which the McAvoys re-argued their evidentiary objections, the court entered an order adopting its Second Tentative Ruling and granting Goldberg's summary judgment motion. On October 9, 2023, the court entered final judgment against the McAvoys for $323,397.30. The McAvoys timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334. We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1.    Did the bankruptcy court err when it granted summary judgment in favor of Goldberg?

2.    Did the bankruptcy court commit reversible error when it overruled the McAvoys' evidentiary objections to the Second Sullivan Declaration?

## STANDARDS OF REVIEW

We review de novo appeals from summary judgments. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002). Evidentiary rulings made in the summary judgment context are reviewed for an abuse of discretion and only support reversal when they might have affected the outcome of the summary judgment motion. *Id.* at 773; *see also Defenders of Wildlife v.*

13

*Bernal*, 204 F.3d 920, 927–28 (9th Cir. 2000) ("Evidentiary rulings are reviewed for an abuse of discretion and should not be reversed absent some prejudice."). The bankruptcy court abused its discretion if it applied an incorrect legal rule or its factual findings were illogical, implausible, or without support in the record. *TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

## DISCUSSION

### A. Summary judgment standards.

Civil Rule 56 is made applicable in adversary proceedings by Rule 7056. *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 707 (9th Cir. 2008). Under Civil Rule 56, summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* "An issue is 'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). And, "[a] fact is 'material' if the fact may affect the outcome of the case." *Id.*

"The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact." *Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). However, when the moving party meets this initial burden, "the burden shifts to the non-moving party to set forth,

14

by affidavit or as otherwise provided in [Civil] Rule 56, specific facts showing that there is a genuine issue for trial." *Id.* (cleaned up).

In meeting these respective "burdens," the parties may rely on a broad range of "materials in the record." *See* Civil Rule 56(c)(1).[4] The court may consider any such materials in the record but only is required to consider those that the parties cite. *See* Civil Rule 56(c)(3). The opposing party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Civil Rule 56(c)(2). But such objections are waived if the opposing party does not raise them. *Orr*, 285 F.3d at 773 n.5; *see also Hoye v. City of Oakland*, 653 F.3d 835, 841 n.3 (9th Cir. 2011) ("Defects in evidence submitted in opposition to a motion for summary judgment are waived absent . . . objection." (citation omitted)).

B. **Analysis and calculation of the amount of the McAvoys' liability.**

The McAvoys have not disputed that the Debtors operated a Ponzi

---

[4] Civil Rule 56(c)(1) states:
(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

scheme from at least January 1, 2007, until PFI filed bankruptcy on July 26, 2020. Nor have they disputed that the existence of this Ponzi scheme is sufficient to establish an actual fraudulent transfer under Cal. Civ. Code § 3439.04(a)(1) and a constructively fraudulent transfer under Cal. Civ. Code § 3439.04(a)(2). This conclusion follows from *Donell v. Kowell*, 533 F.3d 762, 770–71 (9th Cir. 2008), which construed claims for avoidable transfers under California law to recover payments made as part of a Ponzi scheme. *Donell* makes clear that, "[i]n the context of a Ponzi scheme, whether the receiver [or trustee] seeks to recover from winning investors under the actual fraud or constructive fraud theories generally does not impact the amount of recovery from innocent investors." *Id.* at 771. In general, an innocent or "good faith" investor may retain under either fraudulent transfer theory the amount of their initial investment. Thus, they only must disgorge what amounts to "profit" on their investment. *Id.*

*Donell* set forth the specific methodology that courts should employ to determine the amount of a Ponzi scheme investor's fraudulent transfer liability:

> Drawing from [avoidable transfer] theory, federal courts have generally followed a two-step process. First, to determine whether the investor is liable, courts use the so-called "netting rule." Amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability, and the court then determines the actual amount of liability, which may or may not be equal to the net

16

gain, depending on factors such as whether transfers were made within the limitations period or whether the investor lacked good faith. . . .

Second, to determine the actual amount of liability, the court permits good faith investors to retain payments up to the amount invested, and requires disgorgement of only the "profits" paid to them by the Ponzi scheme.

*Id.* at 771-72 (cleaned up). *Donell* further explained: "Although all payments of fictitious profits are avoidable as fraudulent transfers, the appropriate statute of limitations restricts the payments the Ponzi scheme investor may be required to disgorge. Only transfers made within the limitations period are avoidable." *Id.* at 772 (citing *Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1131 (D. Ariz. 2006), *aff'd* 569 F.3d 1015 (9th Cir. 2009)).

The bankruptcy court here followed this methodology. Because there was no dispute that the McAvoys qualified as good faith investors, the court netted the total amounts paid in against the total amounts they actually received. The McAvoys initially invested $940,628.08 from and after January 1, 2007—when the Ponzi scheme was determined to have started. The McAvoys received the aggregate amount of $1,392,785.23 from the Ponzi scheme perpetrators during the pendency of the scheme. Netted together, the McAvoys received $452,157.15 in "net profits" from the Ponzi scheme. The court then capped the McAvoys' liability at $323,397.30, representing the aggregate amount of payments from the Ponzi scheme perpetrators to the McAvoys within the applicable statute of limitations

17

period, July 26, 2013 through July 26, 2020. *See* Cal. Civ. Code § 3439.09(a), (c).[5]

The bankruptcy court's analysis and calculations are consistent with *Donell*. *See Donell*, 533 F.3d at 773-74. The McAvoys have not argued that the bankruptcy court misapplied *Donell* or that *Donell*'s "netting rule" is incorrect and should not be followed. Nor did they argue in their appeal briefs that the amounts from the FTI Report the bankruptcy court relied on are inaccurate. Instead, they make calculations consistent with their own methodology, and then conclude that the amount of their liability is zero. These are the same calculations the bankruptcy court rejected in its denial of the McAvoys' second summary judgment motion. As the bankruptcy court pointed out, the McAvoys cite no authority supporting their methodology, which is inconsistent with the "netting rule" set forth in *Donell*.

The McAvoys additionally contend:

The evidence presented by the Complaint in this case and the FTI report provide[s] no explanation for where the prior deposits came [from], the source of those funds, or why they were deposited into accounts held with PFI. Instead, they appear without any account history or other information, and then are transferred into other accounts again without any explanation.

---

[5] The parties apparently agree that the applicable limitations period began on July 26, 2013, and ended on July 26, 2020, when PFI filed bankruptcy. Consequently, we also accept this as the applicable limitations period.

18

Aplt. Opn. Br. at p. 21 of 25.

However, as the bankruptcy court pointed out, much of the McAvoys' analysis and their purported identification of genuine issues of material fact are based on a false premise: that the court should have traced each amount invested and should have identified and followed the Debtors' and investors' original intent in making the transfers in question. *Donell* explicitly rejected any sort of tracing requirement in favor of the "netting rule" it adopted. 533 F.3d at 773-74. Put bluntly, the "netting rule" is fundamentally inconsistent with any sort of tracing requirement:

> What the [netting] rule means as a practical matter is that a trustee need only determine whether an investor was a net-winner or net-loser when ascertaining whether the investor received profit; the trustee need not match up each investment with each payment made by the debtor and follow the parties' characterizations of the transfers. This may be the only workable rule in the typical Ponzi-scheme case, where documentation of transfers is less than complete, payments are sporadic and not always in accordance with the documentation of the investment, and neither the investor nor the debtor can recall precisely what the parties intended.

*Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) (quoting Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 Am. Bankr. L. J. 157, 167 (1998)), *quoted with approval in Donell*, 533 F.3d at 774.

When we review a matter de novo, we give no deference to the bankruptcy court's decision. *de Jong v. JLE-04 Parker, L.L.C. (In re de Jong)*,

588 B.R. 879, 888 (9th Cir. BAP 2018), *aff'd*, 793 F. App'x 659 (9th Cir. 2020).

But in this instance, having reviewed the same undisputed facts and the same legal authority the bankruptcy court reviewed, we come to the same conclusion. The bankruptcy court correctly and properly determined on summary judgment that the McAvoys were liable for $323,397.30 in Fictitious Profits they received from the Debtors between July 26, 2013 and July 26, 2020.

## C.     The McAvoys' evidentiary objections do not justify reversal.

According to the McAvoys, "[t]he only supporting evidence that [Goldberg] presented in support of [his] motion for summary judgment was the [Second] Sullivan Declaration." The McAvoys argue that most of the Second Sullivan Declaration was inadmissible. They point to Civil Rule 56(c)(4), which states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." They also note that under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The McAvoys further contend that portions of the Second Sullivan Declaration are inadmissible as impermissible opinion testimony of a lay witness under Federal Rule of Evidence 701, as hearsay under Federal Rule of Evidence 802, or both.

There is a fatal, overarching problem with the McAvoys' evidentiary

20

arguments. Evidentiary issues on appeal only are grounds for reversal when they might have affected the outcome of the summary judgment motion. *See Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 811 (9th Cir. 2008) ("To reverse [summary judgment] on the basis of an erroneous evidentiary ruling, we must conclude not only that the bankruptcy court abused its discretion, but also that the error was prejudicial."); s*ee also Orr*, 285 F.3d at 773 (stating that "we must affirm the district court unless its evidentiary ruling was manifestly erroneous **and** prejudicial").

The evidentiary issues the McAvoys have raised did not affect the outcome. Utilizing the First Sullivan Declaration, the Herman Declaration, and most importantly the FTI Report, the bankruptcy court already had determined as a matter of undisputed fact and law that the McAvoys were liable for $323,397.30 in false profits. These materials already were "in the record" as provided by Civil Rule 56(c)(1). The McAvoys did not object to this evidence under Civil Rule 56(c)(2). By not objecting to any of these items, the McAvoys waived any evidentiary objections they might have raised, and the bankruptcy court permissibly could rely on them. *Orr*, 285 F.3d at 774 n.5; *FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 484-85 (9th Cir. 1991).

When one of the parties has authenticated a document in summary judgment proceedings, all parties may use that document for summary judgment purposes. *Orr*, 285 F.3d at 776; *see also Cristobal v. Siegel*, 26 F.3d 1488, 1494 (9th Cir. 1994) (holding that it is not reversible error for the district court to admit for summary judgment purposes evidence that the

opposing party already has authenticated); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550–51 (9th Cir. 1990) (same). This is exactly what happened here with respect to the FTI Report. The McAvoys presented Goldberg's deposition testimony to demonstrate that this report is what it purports to be: an accurate accounting of the transfers into and out of the McAvoys' accounts with the Debtors between January 1, 2007 and July 26, 2020. Then they repeatedly and affirmatively relied on the FTI Report to advance their alternative theory for calculating the amount of their liability. Goldberg used this report for the same purpose.

The McAvoys placed the FTI Report into the record and have never contested the accuracy of the evidence or its sufficiency to establish the amount of their liability under the "netting rule." In short, under these circumstances, the Second Sullivan Declaration was cumulative of the other "materials in the record" to which the McAvoys never objected and permitted both Goldberg and the court to complete the "netting rule" analysis set forth in *Donell*. Consequently, the McAvoys' challenge to the admissibility of the Second Sullivan Declaration did not affect the outcome of the summary judgment motion.[6]

---

[6] Though we do not need to reach the merits of the McAvoys' evidentiary arguments, it is worth noting that their arguments betray a fundamental misunderstanding of how many evidentiary issues "play out" in the summary judgment context. Once an evidentiary objection is properly raised, the proponent has the burden "to show that the material is admissible as presented **or to explain the admissible form that is anticipated**." Civil Rule 56(c)(2) (Advisory Committee Notes accompanying 2010 amendments) (emphasis added). In other words, "authentication

Finally, the McAvoys contend that Goldberg presented "new evidence" in support of his summary judgment motion in his reply brief. Citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), the McAvoys argue that Goldberg's reference in his reply to the materials from the McAvoys' second summary judgment motion—and to the court's ruling thereon—constituted "new evidence" and that the bankruptcy court impermissibly considered these materials without giving them a chance to respond.

We disagree. This so-called "new evidence" was not new at all. Goldberg merely referenced the materials from the prior summary judgment proceedings. This was a timely and appropriate response to the McAvoys' evidentiary objections. *See, e.g., Anigbogu v. Mayorkas*, 2023 WL 8115046, at *3 (N.D. Cal. Nov. 22, 2023) (citing cases and explaining that the proponent of summary judgment evidence must be given an opportunity to respond to summary judgment evidentiary objections and to show that the materials challenged as inadmissible could be submitted in an admissible form at trial); *SE Prop. Holdings, LLC v. Stewart (In re Stewart)*,

and hearsay" objections made during summary judgment proceedings should be overruled, "where the evidence could be presented in an admissible form at trial." *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1232 (N.D. Cal. 2018) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)). While the bankruptcy court here did not need to specifically address it, the prospective admissibility at trial of the key piece of evidence—the FTI Report—was sufficiently demonstrated by the materials submitted in support of the McAvoys' second summary judgment motion, particularly the Goldberg deposition excerpts.

2022 WL 3135293, at *3-4 (Bankr. W.D. Okla. Aug. 3, 2022) (same).

In their opposition to Goldberg's summary judgment motion, the McAvoys had the opportunity to come forward with evidence, facts, and law to demonstrate a triable issue of fact notwithstanding the bankruptcy court's ruling on their second summary judgment motion. Instead, they chose to ignore their second summary judgment motion as if it never occurred.

Based on its ruling denying the McAvoys' second motion for summary judgment, the bankruptcy court could have sua sponte granted summary judgment in favor of Goldberg as the nonmovant under Civil Rule 56(f)(1)—subject to assuring itself that the McAvoys had a full and fair opportunity to present and support their positions. The explicit authority to grant summary judgment in favor of a nonmovant was only added to Civil Rule 56 in 2010, but it has long been the practice of the Ninth Circuit and other circuits to grant summary judgment for a nonmovant in appropriate circumstances. *See Albino v. Baca*, 747 F.3d 1162, 1176–77 (9th Cir. 2014) (en banc) (listing cases); Wright & Miller, 10A FEDERAL PRACTICE AND PROCEDURE, Civil § 2720.1 (4th ed. 2023) (same).

The bankruptcy court opted not to follow the path of Civil Rule 56(f)(1). Instead, Goldberg filed his own summary judgment motion. But he relied on the exact same law, undisputed facts, and key evidence (the FTI Report) to support his position. Under these circumstances, there can be no legitimate question that Goldberg met his summary judgment burden and

24

that the burden shifted to the McAvoys to demonstrate the existence of one or more genuine issues of material fact. This they failed to do. In the procedural context the McAvoys created, the bankruptcy court did not commit reversible error when it granted Goldberg's summary judgment motion.

## CONCLUSION

In sum, the McAvoys never disputed that Goldberg established the elements of his avoidable transfer claims under California law based on the debtors' Ponzi scheme. Rather, they took issue with the calculation of damages resulting in their liability. Their calculations are contrary to the netting of monies in and out required under *Donell*. The McAvoys did not present any evidence contradicting the FTI Report, which Goldberg relied on to calculate his avoidable transfer damages. Instead, they attempted to challenge its authenticity by objecting to the Second Sullivan Declaration. But the McAvoys had already placed the FTI Report into the record for purposes of summary judgment, and the evidence they presented in their second summary judgment motion demonstrated that the applicable accounting from the FTI Report could be presented in admissible form at trial. Thus, the bankruptcy court could consider the accounting from the FTI Report on Goldberg's motion for summary judgment. Because the McAvoys have failed to establish reversible error in the bankruptcy court's grant of summary judgment, we AFFIRM.